[No. 2495–2.   Division Two.   January 25, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. JOSEPH HERRON ATKINSON, *Appellant.*

*Gerard A. Johnson,* for appellant.

*Craig A. Ritchie, Prosecuting Attorney,* and *Bill Knebes, Deputy,* for respondent.

PEARSON, C.J.—This case involves a quarrel between defendant Joseph Atkinson and William Acorn, which resulted in Atkinson's shooting Acorn in the leg with a .38–caliber pistol on a deserted street in Port Angeles, Washington, shortly after midnight on January 11, 1976. Atkinson, who was charged with second–degree assault while armed with a firearm, admitted shooting Acorn, but claimed he acted in self–defense. After hearing evidence on both sides, the jury convicted him. Atkinson appealed, making numerous assignments of error. We are unable to agree with any of appellant's contentions and affirm the judgment.

Because Atkinson and Acorn were the only eyewitnesses to the incident, their testimony was the most crucial evidence in the case. Mr. Acorn told the jury that 3 days before the shooting he had been in a Port Angeles bar talking with the bartender, who was a friend of Atkinson's. Acorn said he told the bartender to warn Atkinson that "someone was looking for Joe Atkinson and was going to do away with him." Acorn said it was his purpose to scare Atkinson, although he did not explain his reason for doing so. Acorn also told the bartender that he knew that Atkinson had beaten up Mrs. Atkinson on some prior occasion. Several nights later, Acorn said he was walking along a street on his way to a tavern when he noticed a man standing and waiting by the curb. When he got close enough to see the man's face, he realized it was Atkinson. Acorn said he spoke Atkinson's name in greeting and that Atkinson replied, "What is this I hear about the rumor you're

spreading around about me beating up my wife?" An argument ensued in which Atkinson became very belligerent. Acorn made no move to touch Atkinson or threaten him in any way. Acorn said that Atkinson suddenly pulled a gun and fired it at him without warning. After Acorn fell to the ground wounded, Atkinson said, "Do you want a couple more?" In addition to Acorn's testimony, the State also introduced the testimony of witnesses who had seen Atkinson wander in and out of several taverns in that area during the course of the evening. They stated that Atkinson never stayed very long at any one of them and appeared to be looking for someone. During final argument, the prosecution asked the jury to infer that that someone was Acorn.

Atkinson's version of the confrontation was significantly different. Atkinson said that not only had he been told that Acorn was spreading rumors that he was a wife–beater and that someone was out to get him, he was also told that Acorn himself had threatened to "take care" of him. Atkinson said he was in Port Angeles on January 11 and had stopped in several taverns looking for a Sharon Hamilton. He was walking down the street when he saw Acorn walking towards him. As they approached each other Acorn said, "Well, if it isn't . . . Joe Atkinson." Atkinson replied, "I heard you've been mean–mouthing me uptown," to which Acorn answered, "You're god damned right I have." Acorn then stepped in front of Atkinson and blocked his path. Atkinson said he made his way around Acorn and began walking backwards down the street, all the time arguing with Acorn. Atkinson said that Acorn tried to grab him several times, but he kept backing away. Finally, Acorn cornered him and seized him by the shoulder, threatening to "get" him while at the same time moving his other hand near his rear pocket. Atkinson said he became fearful that Acorn might have a weapon, so he pulled his pistol and shot Acorn.

At trial, on cross–examination of Atkinson, the first question asked by the prosecutor was, "Mr. Atkinson, are you armed right now?" Upon receiving an affirmative reply,

the prosecutor requested that Mr. Atkinson be disarmed. After a brief recess, an off–the–record discussion took place in chambers. When the trial judge and the attorneys returned to the courtroom, the court requested that Mr. Atkinson turn over his gun to his counsel. Defense counsel refused to take the gun and it was placed on the counsel table, where it remained throughout the cross–examination of defendant.

■ Defendant contends that the manner of disarming him amounted to prosecutorial and judicial misconduct, which denied him the right to a fair trial. It is well settled that if an objection, a curative instruction, or other appropriate motion will prevent or remedy misconduct, counsel must make such a request of the trial court. Counsel cannot ignore the error and then gamble on the verdict. *State v. Stamm,* 16 Wn. App. 603, 559 P.2d 1 (1976). In this instance, counsel objected to neither the prosecutor's question nor the answer, nor did he object when Atkinson placed his gun on the counsel table. Any prejudicial effect from the gun remaining on the table could have been avoided by a request to have the gun removed and the matter cannot be raised for the first time on appeal.

■ The second issue is whether the references to the alleged wife–beating incident were improperly injected into the trial and constitute prosecutorial misconduct. Our review of the record discloses that the prosecution's pursuit of the wife–beating issue was legitimate, not excessive or unduly prejudicial, and did not establish prosecutorial misconduct. *See State v. Torres,* 16 Wn. App. 254, 554 P.2d 1069 (1976). The statements were introduced to show that there was an argument between Acorn and Atkinson. There was no attempt to prove that the statements were true, nor was there any direct attack on Atkinson's character. "Quarrels and disputes between an accused and his victim are competent to show ill will of the accused and a motive for assault." 5 R. Meisenholder, Wash. Prac. § 383, at 387 (1965).

The wife–beating incident was mentioned only three times in 30 pages of direct testimony by Acorn. The first mention was not objected to. The second was objected to as hearsay and the objection was properly overruled. The third mention was unobjected to until the prosecutor asked, "How bad is that [i.e., how bad was the wife beaten]?" At this point, an objection on the grounds of relevancy was sustained. The prosecutor refrained from raising the issue any further with this witness. Subsequently, Officer Myers made a small reference to the wife–beating allegation in his testimony and it was not objected to.

■ On the other hand, counsel for Atkinson mentioned wife–beating in his opening and closing remarks and elicited references to it during cross–examination of Acorn and Officer Myers, as well as during direct examination of Atkinson. Counsel thus waived the error, if any, by failing to make a timely objection and by raising the issue himself. *State v. Huson*, 73 Wn.2d 660, 440 P.2d 192 (1968); *Sherman v. Mobbs*, 55 Wn.2d 202, 347 P.2d 189 (1959).

Defendant next raises the issue of whether the trial court's instructions on self–defense violate the constitutional principles set forth in *Mullaney v. Wilbur*, 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975), and *State v. Roberts*, 88 Wn.2d 337, 562 P.2d 1259 (1977), because the instructions fail to specifically instruct the jury on the burden of proof where self–defense is an issue.[1] The trial court gave three instructions relating to self–defense. The first was a general presumption of innocence and proof beyond a reasonable doubt instruction. The second listed the elements of second–degree assault and reiterated the State's burden of proof.[2] The third instruction defined lawful force

---

[1] Even though Atkinson was tried before *State v. Roberts*, 88 Wn.2d 337, 562 P.2d 1259 (1977) was decided, it has been held that *Roberts* applies to pending cases. *See State v. Modica*, 18 Wn. App. 467, 569 P.2d 1161 (1977). *See also Hankerson v. North Carolina*, 432 U.S. 233, 53 L. Ed. 2d 306, 97 S. Ct. 2339 (1977). (Applies *Mullaney* retroactively.) *Mullaney v. Wilbur*, 421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975).

[2] Instruction No. 2 stated:

"You are instructed that before you can find the defendant JOSEPH HERRON ATKINSON, Guilty of the crime of ASSAULT IN THE SECOND DEGREE, as charged in

and told the jury that "it is not a crime to commit an assault if the assault is committed in self–defense." Atkinson's attorney made no objection to these instructions.[3]

If we find that *Mullaney* and *Roberts* are applicable, we must review these instructions because specific constitutional error possibly invading the defendant's right to a fair trial is involved. *See State v. Peterson,* 73 Wn.2d 303, 438 P.2d 183 (1968); *State v. Louie,* 68 Wn.2d 304, 413 P.2d 7 (1966). Conversely, if we find that *Mullaney* and *Roberts* do not encompass these instructions, we will refuse to review them because counsel failed to provide the trial court with an opportunity to consider the alleged error. *State v. Arndt,* 87 Wn.2d 374, 553 P.2d 1328 (1976).

In determining whether *Mullaney* and *Roberts* apply to this case, it should be pointed out that the constitutional

---

the Information herein, you must find from the evidence, beyond a reasonable doubt, the following essential elements of the crime:

"1. that the defendant, JOSEPH HERRON ATKINSON;

"2. within Clallam County, State of Washington;

"3. on or about the eleventh day of January, 1976;

"4. then and there being;

"5. willfully, unlawfully and feloniously;

"6. did then and there assault the person of William Gordon Acorn, a human being;

"7. with a weapon or thing likely to produce bodily harm and a firearm and deadly weapon, to–wit: a .38 caliber pistol, then and there being held by the said defendant;

"8. and then and there did willfully inflict grievous bodily harm upon the person of the said William Gordon Acorn.

"If you find from all of the evidence in this case that the State has proven beyond a reasonable doubt each and all of the foregoing elements of the offense as charged in the Information, then it will be your duty to return a verdict of Guilty of Assault in the Second Degree.

"If, on the other hand, after weighing all of the evidence and lack of evidence, you entertain a reasonable doubt as to the establishment of any of the foregoing elements, then you must return a verdict of Not Guilty of Assault in the Second Degree."

[3]The instructions given by the trial court follow the suggested instructions and comments prepared by the Supreme Court Committee on Jury Instructions. 11 Wash. Prac. 99–104 (1977).

principles contained in those cases involve the State's ability to shift to the defendant the burden of producing evidence and the burden of persuading the jury on certain issues. *See generally* Recent Developments, *Affirmative Defenses in the Washington Criminal Code—The Impact of Mullaney v. Wilbur,* 51 Wash. L. Rev. 953 (1976). *Mullaney* and *Roberts* only invalidate jury instructions where the effect of those instructions is to place the burden of persuasion on the defendant to negate facts which the State is required by statute to prove beyond a reasonable doubt.

*Roberts* involved the burden of proof of self–defense in a second–degree murder case. One of the elements of second–degree murder, under RCW 9.48.040, is a killing without excuse or justification.[4] Because the State at all times has the burden to prove the facts necessary to constitute the crime, *In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970), *Roberts* held that it was a violation of defendant's due process rights to instruct the jury that it was defendant's burden to prove self–defense to avoid conviction of second–degree murder. *See Mullaney v. Wilbur, supra. Roberts* said that absence of self–defense was, in effect, an element of the offense because RCW 9.48.040 contained the phrase, "unless it is excusable or justifiable" and self–defense is a form of justification. To require the defendant to carry the burden of persuasion on self–defense in that instance was to require the defendant to negate one of the elements of the crime. Due process required the opposite result. The burden was therefore placed on the State to prove the absence of self–defense beyond a reasonable doubt.

■ We think that *Roberts* does not apply to the case at hand. Here we are concerned with second–degree assault as defined by RCW 9.11.020(3), the elements of which are:

---

[4]RCW 9.48.040 has been superseded by RCW 9A.32.050, which does not include absence of excuse or justification as one of the elements of second–degree murder. *See State v. Stepp,* 18 Wn. App. 304, 309 n.1, 569 P.2d 1169 (1977).

(1) grievous bodily harm, (2) willfully inflicted upon another, (3) with or without a weapon. Unlike the murder statute in *Roberts,* the assault statute does not make absence of excuse or justification an element of the crime. Furthermore, unlike *Mullaney,* the defendant was not placed under any burden to negate a fact which the State is required to prove. *See Patterson v. New York,* 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977).[5] Therefore, we conclude that the trial court's instructions on the burden of proof raise no issue of constitutional dimension and, in the absence of proper objection to the court's instructions, we refuse to further examine their sufficiency. *State v. Arndt, supra.*[6]

By special verdict, the jury found that defendant was armed with a firearm when he assaulted Mr. Acorn. Under RCW 9.41.025, this finding subjects defendant to a 5–year mandatory minimum sentence. He challenges this statute on the grounds that it violates constitutional doctrines of equal protection, vagueness, and overbreadth. He also contends that the mandatory minimum sentence provision constitutes cruel and unusual punishment.

■ This case is generally on all fours with *State v. Lewis,* 15 Wn. App. 172, 548 P.2d 587 (1976), in which we held that RCW 9.41.025 is not unconstitutionally vague or violative of the equal protection rights of defendants charged with committing a felony. Furthermore, there is no violation of procedural equal protection because we have no

---

[5]The difference in the elements of second–degree murder and second–degree assault makes the burden of proof instruction a constitutional matter in *State v. Roberts,* 88 Wn.2d 337, 562 P.2d 1259 (1977), but not in this case. We point out, however, that the practice of eliminating a burden of proof instruction on self–defense would appear to be the preferred practice. *See* 11 Wash. Prac. 99 (1977). *But see Patterson v. New York,* 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977).

[6]We see no substantive due process violation in the definition of second–degree assault under RCW 9.11.020(3). *See Patterson v. New York* 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977); *Leland v. Oregon,* 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002 (1952); *Morrison v. California,* 291 U.S. 82, 78 L. Ed. 664, 54 S. Ct. 281 (1934).

showing that the Clallam County prosecutor selectively enforced RCW 9.41.025 in an impermissible manner. *See Oyler v. Boles,* 368 U.S. 448, 7 L. Ed. 2d 446, 82 S. Ct. 501 (1962). In fact, there is no showing that the prosecutor selectively enforced the law at all. A policy stipulation, made part of the record on appeal, shows that persons charged with felonies involving firearms are always charged under RCW 9.41.025 unless (a) there is insufficient evidence to justify the charge, or (b) the charge has been reduced through plea negotiation. *See also State v. Nixon,* 10 Wn. App. 355, 517 P.2d 212 (1973).

■ Defendant's overbreadth argument is not supported by any showing that RCW 9.41.025 interferes with constitutionally protected activity, nor does he refer to any authority to aid us in making such a determination. We do not consider this assignment of error. *State v. Wood,* 89 Wn.2d 97, 569 P.2d 1148 (1977).

On the issue of whether the sentencing provisions of RCW 9.41.025 constitute cruel and unusual punishment, the defendant makes two arguments. First, he contends that the imposition of a mandatory prison sentence without regard to relevant individualizing factors constitutes arbitrary punishment and that arbitrary punishment by definition is cruel and unusual. In support of his argument, he relies on the death penalty cases: *Woodson v. North Carolina,* 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976); *Proffitt v. Florida,* 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976); *Gregg v. Georgia,* 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). Second, defendant urges that his sentence is cruel and unusual because it is so excessive as to shock the conscience. *People v. Lorentzen,* 387 Mich. 167, 194 N.W.2d 827 (1972); *In re Lynch,* 8 Cal. 3d 410, 503 P.2d 921, 105 Cal. Rptr. 217 (1972).

■ Defendant's reading of the death penalty cases is disingenuous. The cases are narrowly drawn and do not extend to mandatory sentences not involving the death penalty. In Woodson, a plurality of the court, in deference to Mr. Justice Rehnquist's dissent, took pains to note that

"the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative." *Woodson v. North Carolina, supra* at 304. In view of the current debate over advisability of nonuniform sentencing procedures, *see* J. Newman, *A Better Way to Sentence Criminals,* 63 A.B.A.J. 1563 (1977); Comment, *Senate Bill 42—The End of the Indeterminate Sentence,* 17 Santa Clara L. Rev. 133 (1977); E. Hennessey, *Disparity in Sentencing,* 3 New England J. Pris. L. 5 (1976), we hesitate to constitutionally require individualized sentencing determinations in nondeath penalty cases. Additionally, RCW 9.95.040 provides a mechanism whereby relevant individualizing factors can be considered, except in cases of first– or second–degree murder, even though a "mandatory minimum" sentence has been imposed.[7]

Turning to defendant's alternate contention that a 5–year minimum sentence for assault with a firearm is cruel and unusual, we begin by pointing out that *State v. Lorentzen, supra,* and *In re Lynch, supra,* which were relied upon by defendant, involve unique facts distinguishable from those involved here. *Lorentzen* involved the sale of narcotics, a nonviolent crime, for which the minimum sentence was 20 years in prison. That penalty was far in excess of the penalty for many violent crimes in Michigan and, in addition, Michigan had recently adopted a new controlled substances act which set the maximum sentence for the same crime at 4 years. *In re Lynch* was an interpretation of California's indeterminate sentence statutes in which the court concluded that Lynch was theoretically sentenced to life imprisonment for a second offense of indecent exposure. The court held that this sentence was excessive.

---

[7]RCW 9.95.040 reads in part: "[T]he board may parole an inmate prior to the expiration of a mandatory minimum term, provided such inmate has demonstrated a meritorious effort in rehabilitation and at least two–thirds of the board members concur in such action . . ."

Atkinson has made no showing that the mandatory minimum sentence for second–degree assault with a firearm is excessive or grossly disparate, either (a) when compared to penalties in other jurisdictions for the same crime, or (b) when compared to the penalty for more serious crimes in Washington. Considering the violent nature of defendant's crime, a 5–year minimum sentence is neither cruel nor unusual.

■ Defendant next assigns error to the failure of the State to allege and prove that he specifically intended to commit a crime while armed with a firearm. In other words, he argues that RCW 9.41.025 requires a specific intent for its violation. The language of the statute is unambiguous.

> Any person who shall commit or attempt to commit any felony, or any misdemeanor or gross misdemeanor categorized herein as inherently dangerous, while armed with, or in the possession of any firearm, shall upon conviction, in addition to the penalty provided by statute for the crime committed without use or possession of a firearm, be imprisoned as herein provided . . .

Plainly, no specific intent is required; overcriminalization is avoided because the statute is limited to felonies, attempted felonies, inherently dangerous misdemeanors, and inherently dangerous gross misdemeanors. Where a statute is unambiguous, there is no need to examine legislative history to construe it. *See State v. Thompson,* 88 Wn.2d 546, 549, 564 P.2d 323 (1977).

■ Atkinson's final contention is that the trial court erred in refusing to grant his motion to dismiss based on insufficiency of the evidence. Defense counsel made his motion at the end of the State's case in chief and renewed his motion at the end of all the evidence. In reviewing the trial court's ruling in this motion, we view the facts and inferences in the light most favorable to the State. *See State v. Randecker,* 79 Wn.2d 512, 487 P.2d 1295 (1971). We think that the evidence, particularly Mr. Acorn's testi-

mony, established a prima facie case of second-degree assault with a firearm and, therefore, the case was rightly given to the jury for a verdict.

The judgment of the trial court is affirmed.

PETRIE and REED, JJ., concur.

Reconsideration denied February 28, 1978.

Review denied by Supreme Court July 21, 1978.