[No. 83768-6.   En Banc.]
Argued January 18, 2011.   Decided June 9, 2011.

Jane Roe, *Petitioner*, v. TeleTech Customer Care Management (Colorado) LLC, *Respondent*.

738

*Michael C. Subit* and *Jillian M. Cutler* (of *Frank Freed Subit & Thomas LLP*), for petitioner.

*James M. Shore* and *Molly M. Daily* (of *Stoel Rives LLP*), for respondent.

*Alison Holcomb*, *Mark M. Cooke*, and *Matthew A. Carvalho* on behalf of American Civil Liberties Union of Washington State, amicus curiae.

*Brian T. Hodges* and *Deborah J. La Fetra* on behalf of Pacific Legal Foundation, amicus curiae.

*Jeffrey L. Needle* and *Lindsay L. Halm* on behalf of Washington Employment Lawyers Association, amicus curiae.

¶1 WIGGINS, J. — In 1998, the people of Washington exercised their constitutional power to enact legislation by initiative when they adopted the Washington State Medical Use of Marijuana Act (MUMA), chapter 69.51A RCW. MUMA provided an affirmative defense against criminal prosecution of physicians for prescribing medical marijuana and of qualified patients and their designated pri-

mary caregivers for engaging in the medical use of marijuana. In this case, we are asked to decide whether MUMA provides a private cause of action against an employer who discharges an employee for authorized medical marijuana use or whether MUMA expresses a clear public policy that employees may not be discharged for authorized medical marijuana use. We hold that MUMA does not provide, either expressly or impliedly, a private cause of action for discharge of an employee who uses medical marijuana nor does MUMA create a clear public policy that would support a claim for wrongful discharge in violation of such a policy.

## FACTS

¶2 Jane Roe[1] suffered from debilitating migraine headaches that caused chronic pain, nausea, blurred vision, and sensitivity to light. Roe took over-the-counter pain medication and prescription drugs for her headaches, but she claims conventional medications did not provide significant relief. On June 7, 2006, Dr. William Minteer prescribed Inderal, advised Roe to discontinue other daily pain medication, and discussed with Roe the possibility of a couple of weeks of discomfort after switching to the new drug.

¶3 On June 26, 2006, Roe became a patient of Dr. Thomas Orvald at The Hemp and Cannabis Foundation (THCF) Medical Clinics in Bellevue. She completed a pain questionnaire, describing her average pain as an 8 on a 1-to-10 scale (where a 10 represented "[p]ain as bad as you can imagine," Clerk's Papers (CP) at 196), and stating pain medications provided her "20%" relief. *Id.* at 197. Roe also stated that she already used cannabis more than four times a day, totaling around one gram. She stated she would use "50%" more cannabis if it were easier and cheaper to obtain. *Id.* at 194.

¶4 That same day, Dr. Orvald provided Roe with a document on THCF letterhead entitled "Documentation of

---

[1] Roe filed suit under a pseudonym because medical marijuana use is illegal under federal law.

Medical Authorization to Possess Marijuana for Medical Purposes in Washington State." *Id.* at 269. In the authorization, Dr. Orvald stated he treated Roe for "a terminal illness or a debilitating condition as defined in RCW 69.51A.010" and in his medical opinion "the potential benefits of the medical use of marijuana would likely outweigh the health risks for this patient." *Id.* Upon receiving the authorization, Roe began using medical marijuana in compliance with MUMA. Medical marijuana alleviated her headache pain with no side effects and allowed Roe to care for her children and to work. Roe ingests marijuana only in her home.

¶5 On October 3, 2006, TeleTech offered Roe a position as a customer service representative at its Bremerton facility.[2] The offer was contingent on the results of reference and background checks and a drug screening. Roe was provided with TeleTech's drug policy requiring all employees to have a negative drug test result. The policy emphasized that noncompliance would result in ineligibility for employment with TeleTech. Roe acknowledged receipt of TeleTech's drug policy, informed TeleTech of her use of medical marijuana, and offered to provide the company with a copy of her authorization. TeleTech declined. Roe took a drug test on October 5, 2006, and started training at TeleTech on October 10. She continued to train and work as a customer service representative until October 18, 2006.

¶6 On October 10, 2006, TeleTech learned of Roe's positive drug test results. Roe's supervisor contacted TeleTech's corporate headquarters and confirmed the company's drug policy does not make an exception for medical marijuana. On October 18, TeleTech terminated Roe's employment.

---

[2] TeleTech is a business process outsourcing company based in Colorado. At its Bremerton facility, TeleTech provides Sprint Nextel with telemarketing and telesales services. Customer service representatives at the Bremerton facility handle sales calls and customer service issues.

¶7 In February 2007, Roe sued TeleTech in Kitsap County Superior Court for wrongful termination.[3] Roe claimed (1) TeleTech terminated her employment in violation of MUMA and (2) TeleTech terminated her employment in violation of a clear public policy allowing medical marijuana use in compliance with MUMA. Both parties filed motions for summary judgment. TeleTech asserted MUMA does not provide employment protections to medical marijuana users or a civil cause of action against a private party. It also argued federal law precluded MUMA's authorization of medical marijuana use. Finally, TeleTech argued MUMA has a narrow purpose—namely, to provide users and physicians with an affirmative defense under state drug laws, not to broadly entitle users to employment protections.

¶8 The superior court granted TeleTech's motion for summary judgment. Holding that MUMA provides only an affirmative defense to criminal prosecution under state drug laws and does not imply a civil cause of action, the Court of Appeals affirmed the superior court's grant of summary judgment to TeleTech. *Roe v. TeleTech Customer Care Mgmt. (Colo.), LLC*, 152 Wn. App. 388, 216 P.3d 1055 (2009). Based on the unambiguous language of MUMA, we affirm.

## ANALYSIS

¶9 We review a lower court's grant of summary judgment and questions of statutory interpretation de novo. *Hubbard v. Spokane County*, 146 Wn.2d 699, 707, 50 P.3d 602 (2002); *Rozner v. City of Bellevue*, 116 Wn.2d 342, 347, 804 P.2d 24 (1991).

---

[3] TeleTech removed the action to the United States District Court for the Western District of Washington on March 27, 2007, asserting diversity jurisdiction. The federal district court granted Roe's motion to remand the case because TeleTech could not prove that the amount in controversy was at least $75,000. *Roe v. Teletech Customer Care Mgmt. (Colo.), LLC*, No. C07-5149 RBL, 2007 WL 1655172, 2007 U.S. Dist. LEXIS 41112 (W.D. Wash. June 6, 2007) (unpublished).

I. MUMA does not prohibit an employer from discharging an employee for authorized use of medical marijuana

¶10 Washington voters approved Initiative Measure 692 (I-692), MUMA, on November 3, 1998, and it is codified at chapter 69.51A RCW. The purpose section of the statute states, "The people of Washington state find that some patients with terminal or debilitating illnesses, under their physician's care, may benefit from the medical use of marijuana." Former RCW 69.51A.005 (1999). The section identifies some of the conditions "for which marijuana appears to be beneficial," including "some forms of intractable pain." *Id*. The section continues:

> The people find that humanitarian compassion necessitates that the decision to authorize the medical use of marijuana by patients with terminal or debilitating illnesses is a personal, individual decision, based upon their physician's professional medical judgment and discretion.

¶11 Therefore, the people of the state of Washington intend that

> [q]ualifying patients with terminal or debilitating illnesses who, in the judgment of their physicians, would benefit from the medical use of marijuana, shall not be found guilty of a crime under state law for their possession and limited use of marijuana . . . .

*Id*. The section also states the intent of the voters to provide a defense to caregivers and physicians. *Id*. A subsequent section of MUMA provides an affirmative defense to both qualifying patients and caregivers. RCW 69.51A.040(1).

¶12 The only reference to employment in MUMA as passed by the voters in the initiative provided, "Nothing in this chapter requires any accommodation of any medical marijuana use in any place of employment, in any school bus or on any school grounds, or in any youth center." Former RCW 69.51A.060(4) (1999).

¶13 The legislature amended MUMA in 2007, declaring:

The legislature intends to clarify the law on medical marijuana so that the lawful use of this substance is not impaired and medical practitioners are able to exercise their best professional judgment in the delivery of medical treatment, qualifying patients may fully participate in the medical use of marijuana, and designated providers may assist patients in the manner provided by this act without fear of state criminal prosecution. This act is also intended to provide clarification to law enforcement and to all participants in the judicial system.

LAWS OF 2007, ch. 371, § 1. The legislature amended MUMA's reference to employment, revising RCW 69.51A.060(4) to read, "Nothing in this chapter requires any accommodation of any *on-site* medical use of marijuana in any place of employment, in any school bus or on any school grounds, in any youth center, *in any correctional facility, or smoking medical marijuana in any public place as that term is defined in RCW 70.160.020.*" RCW 69.51A.060 (2007 amendment italicized).

## A. The language of MUMA is unambiguous

¶14 The rules of construction applied to statutes also apply to initiatives. *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 205, 11 P.3d 762 (2001). The court's purpose when determining the meaning of a statute enacted by the initiative process is to determine the intent of the voters who enacted the measure. *Id.* This court focuses on the language of the statute "as the average informed voter voting on the initiative would read it." *Id.* If the voters' intent is clear, this court need not look further. *Id.* ("Where the language of an initiative enactment is 'plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation.' " (quoting *State v. Thorne*, 129 Wn.2d 736, 762-63, 921 P.2d 514 (1996))); *Duke v. Boyd*, 133 Wn.2d 80, 87, 942 P.2d 351 (1997) ("When the words in a statute are clear and unequivocal, this court is required to assume the Legislature meant exactly what it said and apply the statute as written."). An ambiguity

exists if statutory language "is subject to more than one reasonable interpretation." *In re Marriage of Kovacs*, 121 Wn.2d 795, 804, 854 P.2d 629 (1993). If there is ambiguity in an initiative, the court may look to extrinsic evidence of the voters' intent such as statements in the voters' pamphlet. *Amalgamated Transit*, 142 Wn.2d at 205.

¶15 Both parties argue this court can determine the meaning of MUMA from the enactment's plain language. Roe claims the original language in RCW 69.51A.005, .040, and .060(4) demonstrates MUMA's sweeping purpose, which was to provide not only an affirmative defense to criminal prosecution, but also to prohibit an employer from discharging an employee for authorized use of medical marijuana. Specifically, Roe argues RCW 69.51A.040(2)'s protection against a denial of "any right or privilege" protects an employee from being denied the privilege of employment due to authorized medical marijuana use. In contrast, TeleTech argues MUMA's language unambiguously does not provide employment protections.

¶16 This court will not read a statutory phrase in isolation; its language takes meaning from the enactment as a whole. *Amalgamated Transit*, 142 Wn.2d at 220; *W. Petroleum Imps., Inc. v. Friedt*, 127 Wn.2d 420, 428, 899 P.2d 792 (1995) ("When construing a statute we must read it in its entirety, not piecemeal, and interpret the various provisions of the statute in light of one another."). The language upon which Roe relies for her claim that MUMA protects medical marijuana users from denial of the privilege of employment immediately follows MUMA's grant of an affirmative defense to qualifying patients and caregivers:

> If charged with a violation of state law relating to marijuana, any qualifying patient who is engaged in the medical use of marijuana, or any designated primary caregiver who assists a qualifying patient in the medical use of marijuana, will be deemed to have established an affirmative defense to such charges by proof of his or her compliance with the requirements provided in this chapter. Any person meeting the requirements

appropriate to his or her status under this chapter shall be considered to have engaged in activities permitted by this chapter and shall not be penalized in any manner, or denied any right or privilege, for such actions.

Former RCW 69.51A.040(1) (1999). The first sentence of subsection (1) establishes the context of the subsection: it applies to a person charged with violation of state law relating to marijuana. The second sentence applies in this same context of criminal proceedings; it does not address the actions or duties of private entities. *Id.* The section's prohibition against a denial of "any right or privilege," when read in context, does not confer any obligation on private employers.

¶17 Roe argues the original language of RCW 69.51A-.060(4) confirms that employment is one of the "privileges" protected by RCW 69.51A.040(1). Roe claims that because RCW 69.51A.060(4) explicitly does not require an employer to accommodate medical marijuana use "in any place of employment," the statute implicitly requires an employer to accommodate an employee's medical marijuana use *outside* the workplace. But the statute's explicit statement against an obligation to accommodate on-site use does not require reading into MUMA an implicit obligation to accommodate off-site medical marijuana use.[4] The language of MUMA is unambiguous—it does not regulate the conduct of a private employer or protect an employee from being discharged because of authorized medical marijuana use.

---

[4] Amicus Pacific Legal Foundation aptly addressed the logical fallacy of Roe's argument. Amicus Curiae Br. of Pac. Legal Found. at 11-13. As amicus explains, when the major premise is a universal negative (employers are not required to accommodate on-site use), and the minor premise negates one aspect of the major (the plaintiff uses marijuana off-site), it is logically invalid to adopt as a conclusion the contrapositive (employers are required to accommodate off-site use). *Id.* at 12 (citing *Bailey v. State*, 16 Md. App. 83, 294 A.2d 123, 129 n.4 (1972); RUGGERO J. ALDISERT, LOGIC FOR LAWYERS: A GUIDE TO CLEAR LEGAL THINKING 156-58 (3d ed. 1997)). The argument is flawed for the additional reason that the major term—off-site use—does not appear in the major premise. Amicus Curiae Br. of Pac. Legal Found. at 11-13.

B. Extrinsic evidence does not support an implicit duty to accommodate off-site use of marijuana

1. Drafter's declaration

¶18  Even if the language of MUMA were ambiguous, the extrinsic evidence cited by Roe would not support reading an employment protection into the statute. Roe argues statements by Timothy Killian, a co-drafter and campaign manager for I-692, demonstrate that voters intended MUMA to prohibit the discharge of an employee for authorized use of medical marijuana. In a declaration prepared for this litigation, Killian stated MUMA was intended to broadly protect the right of qualifying patients to use medical marijuana and to protect the "privilege" of employment.[5]

¶19  Roe claims this court's holdings in *Duke*, 133 Wn.2d 80, and *Kovacs*, 121 Wn.2d 795, allow this court to rely on Killian's declaration as evidence of the voters' intent. In both cases, a legislator's statement regarding language in a statute was relevant to the question of the legislature's intent. While "[n]ormally, one legislator's comments from the floor are . . . inadequate to establish legislative intent," where the legislator proposed the enacted language and no evidence in the record contradicted the legislator's statement as to the meaning of the language, this court in *Duke* presumed that the legislator "understood the meaning of the amendment which he proposed" and found his statement (made at the time the legislature was debating the bill) supported the plain meaning of the statute. 133 Wn.2d at 87. Similarly, in *Kovacs* this court acknowledged that individual lawmakers' statements do not conclusively establish legislative intent, but noted such statements can be "instructive" in illustrating the reasons for proposed

---

[5] Citing Killian's declaration, Roe explains, "By providing that employers were not required to accommodate the *use* of medical marijuana *in* any *place* of employment, MUMA was intended to require employers to accommodate an employee's use of marijuana *outside* of the workplace, as long as that use complies with the Act." Appellant's Opening Br. at 5.

changes to legislation. 121 Wn.2d at 807. In *Kovacs* no evidence in the record contradicted the remarks of a "prime sponsor and drafter of the bill," so it was appropriate to consider his comments when determining the purpose of the statutory language. *Id.* at 807-08.

¶20 While *Duke* and *Kovacs* support looking to statements of individual drafters and sponsors of statutory language, they do not support considering Killian's declaration as evidence of the voters' intent in approving I-692. First, unlike the relevant statements in *Duke* and *Kovacs*, where a legislator made a statement while the legislature was debating the proposed statutory language, Killian made the declaration Roe relies upon almost 10 years after voters approved I-692. In *Duke* and *Kovacs*, the other legislators were aware of the intent of the drafters when they voted on the statute, but in this case, no voter could have been aware in 1998 that Killian would opine in 2008 that the initiative would insulate employees from drug testing for marijuana if the employee qualified for the medical use of marijuana.

¶21 Second, the relevant statement in *Duke* supported a plain reading of the statute; the court considered the statement only after finding the amended language "clear." 133 Wn.2d at 86. In contrast, Killian's declaration claims MUMA contains specific protections that are not supported by the text of the statute. It is the voters' intent that is relevant to the meaning of ambiguous initiative language. If we were to accept Killian's declaration as evidence of the voters' intent, it would give drafters an incentive to write vague language to be expanded in later litigation—language that would not give voters a true representation of the meaning and consequences of the proposed initiative.

### 2. 2007 changes to MUMA

¶22 In 2007, the legislature stated its intent to clarify the MUMA "so that the lawful use of [medical marijuana] is not impaired . . . ." LAWS OF 2007, ch. 371, § 1. The legislature

added "on-site" to RCW 69.51A.060(4) so that it now provides, in relevant part, "Nothing in this chapter requires any accommodation of any *on-site* medical use of marijuana in any place of employment." (Emphasis added.) Roe argues the 2007 enactment shows that the limits on workplace accommodation obligations set forth in I-692 were always intended to apply only to the *on-site* use of medical marijuana.

¶23 If a statute is ambiguous, we may look to the statute's subsequent history to clarify the original legislative intent.[6] *State v. Bunker*, 169 Wn.2d 571, 581, 238 P.3d 487 (2010). A new legislative enactment is presumed to be an amendment that changes a law rather than a clarification of the existing law, but the presumption may be rebutted by clear evidence that the legislature intended an interpretive clarification. *State v. Elmore*, 154 Wn. App. 885, 905, 228 P.3d 760 (2010) (citing *Johnson v. Morris*, 87 Wn.2d 922, 926, 557 P.2d 1299 (1976)). One indication a new enactment is a clarification is that the original statute was ambiguous. *Id.* In contrast, an amendment generally changes an unambiguous statute. *Id.*

¶24 Even assuming the 2007 enactment clarified the rights and obligations created by the original initiative, the clarifying language does not support Roe's argument that MUMA provides employment protections for authorized medical marijuana users. The legislature's addition of the phrase "on-site" to RCW 69.51A.060(4) is redundant because the section already expressly disavowed any accommodation obligation "in any place of employment." The addition of "on-site" did not make any material change in the section. Neither the original nor the current language of

---

[6] Subsequent legislative changes to a statute can be evidence of the legislative intent of the original statute. *State v. Mendoza*, 165 Wn.2d 913, 921, 205 P.3d 113 (2009). But the 2007 legislative changes to MUMA amended or clarified an initiative passed by the voters. Because we do not find the changes helpful to Roe's position, we briefly address the 2007 changes to MUMA without deciding whether *legislative* changes to an initiative may be evidence of the *voters'* intent in approving the original initiative.

MUMA requires employers to accommodate an employee's off-site use of medical marijuana.

¶25 Roe claims using medical marijuana in her home in the evening allowed her to be productively employed the next day, acknowledging that the use of marijuana continues to influence a patient for some time after ingestion. One would expect any statute creating employment protections for authorized medical marijuana users might include exceptions for certain occupations or permissible levels of impairment on the job. Indeed, describing MUMA's alleged employment protections, Roe argues an employer has a duty only to accommodate an employee's off-site medical marijuana use if the employee's use would not affect job safety or performance. But nothing in MUMA suggests the drafters or voters considered such issues or contemplated the regulatory scheme suggested by Roe's proposed safety and performance exceptions. This statutory silence supports the conclusion that MUMA does not require employers to accommodate off-site medical marijuana use.

### 3. Voters pamphlet

¶26 If a statute passed by initiative is ambiguous, the voters pamphlet may provide extrinsic evidence of the voters' intent. *Amalgamated Transit*, 142 Wn.2d at 205. The official ballot title of I-692 was "Shall the medical use of marijuana for certain terminal or debilitating conditions be permitted, and physicians authorized to advise patients about medical use of marijuana?" State of Washington *Voters Pamphlet*, General Election 8 (Nov. 3, 1998) (1998 Voters Pamphlet). The attorney general's statement explained that the initiative would not "require the accommodation of any medical use of marijuana in any place of employment . . . ." *Id.* at 16. In the "Statement For" I-692, proponents of the initiative stated, "[P]atients who use medical marijuana, and doctors who recommend it, are still considered criminals in this state. Initiative 692 will protect patients who suffer from terminal and debilitating illnesses, and doctors who recommend the use of medical

marijuana. That's why we need I-692." *Id.* at 8. The only statement in the voters' materials referencing employment was also in the "Statement For" I-692, where proponents assured voters that MUMA would "[p]rohibit[ ] marijuana use . . . in the workplace."[7] *Id.* The "Statement Against" I-692 was silent as to any employment protections possibly granted by I-692. *Id.* at 9.

¶27 Nothing in the 1998 Voters Pamphlet demonstrates that an average voter would understand the proposed initiative to offer employment protections to medical marijuana users. If proponents of I-692 wanted voters to approve language that would enact employment protections, they should have clearly explained to voters the consequences of the initiative. *See Ross v. RagingWire Telecomms., Inc.*, 42 Cal. 4th 920, 929, 174 P.3d 200, 70 Cal. Rptr. 3d 382 (2008) (holding that proponents of California's Compassionate Use Act of 1996, CAL. HEALTH & SAFETY CODE § 11362.5, intended a delicate balance and presented only "modest objectives" to the voters that could not support a broad reading of the act to include employment protections that were not in the text of the statute).

C. MUMA does not imply a civil remedy

¶28 In addition to arguing that MUMA creates an express civil remedy, Roe claims that the court should find in MUMA an implied cause of action for wrongful discharge for authorized medical marijuana use. In *Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990), this court established the test for an implied cause of action:

> Borrowing from the test used by federal courts in determining whether to imply a cause of action, we must resolve the following issues: first, whether the plaintiff is within the class for whose "especial" benefit the statute was enacted; second, whether the legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a

---

[7] The proponents of I-692 overstated MUMA's "[s]afeguards." 1998 Voters Pamphlet at 8. Nothing in MUMA prohibits an employer from choosing to accommodate an employee's use of medical marijuana.

remedy is consistent with the underlying purpose of the legislation.

If MUMA protects medical marijuana users by proscribing certain conduct or creating a duty but does not provide a remedy for a violation of the statute, a cause of action may be inferred if " 'the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision.' " *Id.* at 920 (quoting RESTATEMENT (SECOND) OF TORTS § 874A (1979)).

¶29 The first *Bennett* requirement is not at issue because Roe, as a medical marijuana user, is within the class for whose special benefit the people approved I-692. However, as discussed above, there is no evidence voters intended MUMA to provide employment protections or to prohibit an employer from discharging an employee for medical marijuana use. Further, implying a cause of action against a private entity is inconsistent with a statutory scheme intended to provide an affirmative defense to state criminal prosecution. MUMA does not imply a cause of action against an employer.[8]

## II. MUMA does not proclaim a sufficient public policy to support a cause of action for wrongful termination

¶30 Common law at-will employment has been the default employment rule in Washington since at least 1928. *Ford v. Trendwest Resorts, Inc.*, 146 Wn.2d 146, 152, 43 P.3d 1223 (2002) (citing *Davidson v. Mackall-Paine Veneer Co.*, 149 Wash. 685, 688, 271 P. 878 (1928)). An employer may discharge an at-will employee for "no cause, good cause or

---

[8] This case is distinguishable from our recent decision in *Beggs v. Department of Social & Health Services*, 171 Wn.2d 69, 247 P.3d 421 (2011), where we found an implied cause of action in the mandatory child abuse reporting statute, RCW 26.44.030. First, the reporting statute grants immunity from civil liability, implying civil liability exists. *Id.* at 78. In contrast, MUMA grants qualified patients and caregivers immunity from criminal liability. RCW 69.51A.040(1). Second, the cause of action implied by the reporting statute is consistent with the purpose of the statute—to safeguard children. Here, the purpose of MUMA is to insulate qualified patients and caregivers from criminal liability under state law, not to create an expansive right to use medical marijuana without regard to other restrictions.

even cause morally wrong without fear of liability." *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 226, 685 P.2d 1081 (1984). One narrow exception to the general at-will employment rule prohibits an employer from discharging an employee "when the termination would frustrate a clear manifestation of public policy." *Ford*, 146 Wn.2d at 153.

A. A public policy mandate giving rise to a wrongful termination action must be clear

¶31 This court added Washington to the growing list of jurisdictions to recognize an action for wrongful termination in violation of public policy in 1984, stating:

"In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, *courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject.*"

*Thompson*, 102 Wn.2d at 232 (quoting *Parnar v. Americana Hotels, Inc.*, 65 Haw. 370, 652 P.2d 625, 631 (1982)). The tort action is a "narrow public policy exception" to the at-will employment doctrine that balances the employee's interest in job security and the employer's interest in making personnel decisions without fear of liability. *Id.*

¶32 *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996), refined the analysis of the action, recognizing that the action has generally arisen in the past in four situations:

(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.

¶33 The test we use to analyze a public policy wrongful discharge action where both the employee and the employer have legitimate interests requires four elements:

(1) The plaintiffs must prove the existence of a clear public policy (the *clarity* element).

(2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the *jeopardy* element).

(3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the *causation* element).

(4) The defendant must not be able to offer an overriding justification for the dismissal (the *absence of justification* element).

*Id.* at 941 (citations omitted). Whether a clear public policy exists is a question of law subject to de novo review. *Danny v. Laidlaw Transit Servs., Inc.*, 165 Wn.2d 200, 207, 193 P.3d 128 (2008). The exception should be narrowly drawn so that it does not swallow the general rule of at-will employment. *Sedlacek v. Hillis*, 145 Wn.2d 379, 389-90, 36 P.3d 1014 (2001).

B. MUMA does not proclaim a public policy prohibiting the discharge of an employee for medical marijuana use

¶34 A statute may provide a public policy mandate for purposes of a wrongful termination claim even where the employer's conduct is beyond the reach of the statute's remedies. *See Roberts v. Dudley*, 140 Wn.2d 58, 71, 993 P.2d 901 (2000).[9] Thus, though MUMA does not imply a cause of action against an employer who discharges an employee for

---

[9] In *Roberts*, an employee claimed she was discharged because she was pregnant. She brought an action for wrongful termination in violation of a clear public policy against sex discrimination. *Id.* at 62. This court found support for the public policy under chapter 49.60 RCW, a statute that prohibits employment discrimination on the basis of sex. *Id.* at 69-70. Though the employer in *Roberts* was immune from liability under chapter 49.60 RCW because it employed fewer than eight employees, the statute established a clear public policy for purposes of the employee's wrongful termination claim. *Id.* at 71.

using medical marijuana, it could still provide the basis for Roe's wrongful termination claim.

¶35 An employee must establish a clear statement of public policy to satisfy the clarity element. *Hubbard v. Spokane County*, 146 Wn.2d 699, 708, 50 P.3d 602 (2002). "The 'public policy' for which we search is an authoritative public declaration of the nature of the wrong." *Roberts*, 140 Wn.2d at 63 (quoting *Thompson*, 102 Wn.2d at 232). A clear mandate of public policy sufficient to meet the clarity element must be clear and truly public; it does not exist merely because the plaintiff can point to legislation or judicial precedent that addresses the relevant issue. *Sedacek*, 145 Wn.2d at 389.

¶36 The employee bears the burden to establish that a clear statement of public policy exists. *Hubbard*, 146 Wn.2d at 708. Roe argues MUMA proclaims a broad policy that " 'the medical use of marijuana by patients with terminal or debilitating illnesses is a personal, individual decision.' " Appellant's Opening Br. at 27-28 (quoting RCW 69.51A.005). Roe also claims Washington courts have recognized that MUMA's purpose is to protect the right of qualifying patients to use medical marijuana in accordance with the advice and supervision of their physicians.

¶37 MUMA's language and court decisions interpreting the statute do not support such a broad public policy that would remove all impediments to authorized medical marijuana use or forbid an employer from discharging an employee because she uses medical marijuana. MUMA's only reference to employment is an explicit statement against requiring employers to accommodate medical marijuana use. *See* RCW 69.51A.060(4) ("Nothing in this chapter requires any accommodation of any on-site medical use of marijuana in any place of employment . . . ."). Similarly, the only reference to employment in the 1998 Voters Pamphlet asserted the initiative would prohibit marijuana use in the workplace.

¶38 Moreover, the statement upon which Roe relies for the broad proposition that the choice to use medical mari-

juana is a "personal, individual decision" logically refers to the decision of the physician, not the patient. The full sentence reads, "The people find that humanitarian compassion necessitates that the decision to authorize the medical use of marijuana by patients with terminal or debilitating illnesses is a personal, individual decision, based upon their health care professional's professional medical judgment and discretion." RCW 69.51A.005. The "decision" referred to in the first part of the sentence is the "decision to authorize the medical use of marijuana . . . ," which is the physician's decision, not the patient's. The decision is "based upon their health care professional's professional medical judgment and discretion," which again refers to the physician's decision, not the patient's decision. This sentence of RCW 69.51A.005 does not support a broad public policy supporting employment protections for medical marijuana users.

¶39 The Court of Appeals has frequently quoted the general purpose section of MUMA, but no court decision has provided "an authoritative public declaration" declaring an unimpeded right to use medical marijuana or prohibiting an employer from discharging an employee for medical marijuana use. *Roberts*, 140 Wn.2d at 63. Citing RCW 69.51A.005, the Court of Appeals in *State v. Hanson* stated MUMA's purpose is "to allow patients with terminal or debilitating illness to legally use marijuana when authorized by their physician." 138 Wn. App. 322, 329, 157 P.3d 438 (2007). However, the *Hanson* court recognized that MUMA does not provide unlimited authorization to use medical marijuana, stating, "[U]se is permitted if specific legislative procedures are followed" and, "[T]he Medical Marijuana Act only provides an affirmative defense to the drug crime." *Id.* at 330. Similarly in *State v. Ginn*, the Court of Appeals stated the general purpose of MUMA "is to allow patients with terminal or debilitating illnesses to use marijuana." 128 Wn. App. 872, 877, 117 P.3d 1155 (2005). But the court discussed MUMA's purpose in the context of applying the affirmative defense provided by the statute to

qualifying patients and physicians. *Id.* Washington court decisions do not recognize a broad public policy that would remove any impediment to medical marijuana use or impose an employer accommodation obligation.

¶40 Finally, Washington patients have no legal right to use marijuana under federal law. *See* 21 U.S.C. §§ 812, 844(a). Though Roe claims the divergence between Washington's MUMA and federal drug law is of no consequence to a state tort claim for wrongful discharge, the two cannot be completely separated.[10] Holding that a broad public policy exists that would require an employer to allow an employee to engage in illegal activity would not be within *Thompson*'s directive to " 'proceed cautiously' " when finding a public policy exception to the at-will employment doctrine. 102 Wn.2d at 232 (emphasis omitted) (quoting *Parnar*, 652 P.2d at 631).

¶41 Roe has presented only one public policy argument to support her wrongful termination claim—that MUMA broadly protects a patient's "personal, individual decision" to use medical marijuana. MUMA does not proclaim a public policy that would remove any impediment (including employer drug policies) to the decision to use medical marijuana.[11] Because Roe has not satisfied the clarity

---

[10] We note that the Washington State Human Rights Commission, the agency charged with investigating employee discrimination claims, acknowledges that "it would not be a reasonable accommodation of a disability for an employer to violate federal law, or allow an employee to violate federal law, by employing a person who uses medical marijuana." LAURA LINDSTRAND, WASH. STATE HUMAN RIGHTS COMM'N, WASHINGTON NON-DISCRIMINATION LAWS AND THE USE OF MEDICAL MARIJUANA at 1 (June 7, 2011), *available at* http://www.hum.wa.gov/Documents/Guidance/medical%20marijuana.doc. Though an employee is still free to sue an employer for wrongful discharge, the commission will not investigate claims of discrimination due to medical marijuana use because federal law prohibits marijuana possession. *Id.* at 2.

[11] In *Gardner*, the employee, discharged because he left his armored vehicle to help a hostage in a bank robbery, claimed statutes supported a public policy encouraging citizens to help law enforcement. 128 Wn.2d at 942. This court held that the cited statutes supported such a policy, "but only under very limited circumstances." *Id.* More accurately, the statutes supported a policy encouraging citizens to cooperate with law enforcement when help was requested or required by law. *Id.* This court concluded, "A limited, albeit clear, public policy can be found in the cited statutes, but Plaintiffs give an overexpansive reading of those statutes

element, we do not need to analyze the other elements of the *Gardner* test. *See Gardner*, 128 Wn.2d at 943.

## CONCLUSION

¶42 MUMA does not prohibit an employer from discharging an employee for medical marijuana use, nor does it provide a civil remedy against the employer. MUMA also does not proclaim a sufficient public policy to give rise to a tort action for wrongful termination for authorized use of medical marijuana.

¶43 We affirm.

MADSEN, C.J., and C. JOHNSON, ALEXANDER, OWENS, FAIRHURST, J.M. JOHNSON, and STEPHENS, JJ., concur.

¶44 CHAMBERS, J. (dissenting) —

The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics.

OLIVER WENDELL HOLMES, THE COMMON LAW 5 (Mark DeWolfe Howe ed., 1967) (1881). The court today makes an exacting, logically defensible, minute examination of the Washington State Medical Use of Marijuana Act, chapter 69.51A RCW, and concludes that our law, like conventional medicine, affords Jane Roe no relief. But the approach it takes would

in their attempt to present a general policy encouraging citizens to help in law enforcement. Plaintiffs have not satisfied the clarity element with respect to their first offered public policy." *Id.* at 942-43. Similarly, Roe has given an overexpansive reading of MUMA in her attempt to present a general public policy providing an unimpeded right to use medical marijuana with a physician's authorization. MUMA does not provide such an unlimited right.

have forestalled significant developments in the law. *See, e.g., Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 913 P.2d 377 (1996). Because I conclude that a jury should hear Roe's claim for wrongful discharge in violation of public policy, I respectfully dissent.

¶45 I stress a few of the salient facts. The people of our state enacted the medical marijuana act by initiative because they concluded that "humanitarian compassion necessitates that the decision to authorize the medical use of marijuana by patients with terminal or debilitating illnesses is a personal, individual decision, based upon their physician's professional medical judgment and discretion." LAWS OF 1999, ch. 2, § 2 (Initiative Measure 692, approved Nov. 3, 1998) (codified as RCW 69.51A.005). It says plainly that "[a]ny person meeting the requirements appropriate to his or her status under this chapter shall be considered to have engaged in activities permitted by this chapter *and shall not be penalized in any manner, or denied any right or privilege*, for such actions." *Id.* § 5 (emphasis added) (codified as RCW 69.51A.040(2)).

¶46 Roe seems to be exactly the sort of person the people intended to protect. She suffered from debilitating migraine headaches that resisted treatment. A doctor advised her that the potential benefits of marijuana likely outweighed the health risks. Her migraines subsided enough that she could seek and find a job.

¶47 The tort of wrongful discharge in violation of public policy exists to protect Washington workers in such straits. "(1) The plaintiffs must prove the existence of a clear public policy (the *clarity* element)," (2) "that discouraging the conduct in which they engaged would jeopardize the public policy (the *jeopardy* element)," "(3) . . . that the public-policy-linked conduct caused the dismissal (the *causation* element)," and "(4) [t]he defendant must not be able to offer an overriding justification for the dismissal (the *absence of justification* element)." *Gardner*, 128 Wn.2d at 941 (citing HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES §§ 3.7, 3.14, 3.19, 3.21 (1991)); *see also Danny v. Laidlaw*

*Transit Servs., Inc.*, 165 Wn.2d 200, 207, 193 P.3d 128 (2008).

¶48 In my view, the first element is easily satisfied. The public policy is clear and is stated on the first page of the act. "The people find that humanitarian compassion necessitates that the decision to authorize the medical use of marijuana by patients with terminal or debilitating illnesses is a personal, individual decision, based upon their health care professional's professional medical judgment and discretion." RCW 69.51A.005; *see also* RCW 69.51A.040(2) ("Any person meeting the requirements appropriate to his or her status under this chapter shall be considered to have engaged in activities permitted by this chapter and shall not be penalized in any manner, or denied any right or privilege, for such actions."). This court has also recognized this clear policy. "As a compassionate gesture, the people of this state, by initiative, allowed patients afflicted with medical conditions that might be eased by marijuana to use it under limited circumstances." *State v. Fry*, 168 Wn.2d 1, 14, 228 P.3d 1 (2010) (Chambers, J., concurring); *accord Fry*, 168 Wn.2d at 20 (Sanders, J., dissenting). True, the act's operative sections focus on creating an affirmative defense. But this language is broad and we undermine the people's will by treating it as merely decorative. Even the limitations in the act support finding a policy in favor of allowing medical marijuana in situations like this one. The initiative said that "[n]othing in this chapter requires any accommodation of any medical use of marijuana in any placement of employment, in any school bus or on any school grounds, or in any youth center." LAWS OF 1999, ch. 2, § 8(4) (Initiative Measure 692, approved Nov. 3, 1998). Since then, the legislature has clarified that last provision to say that "[n]othing in this chapter requires any accommodation of any *on-site* medical use of marijuana in any place of employment," clearly indicating a legislative intent that off-site use does require accommodation. RCW 69.51A.060(4) (emphasis added).

¶49 To satisfy the jeopardy element, Roe must show that " 'discouraging the conduct in which [she] engaged would

jeopardize the public policy' " and " '*directly relates* to the public policy, or was *necessary* for the effective enforcement of the public policy.' " *Danny*, 165 Wn.2d at 222 (alteration in original) (quoting *Gardner*, 128 Wn.2d at 941, 945). She has met this burden. Allowing someone to be fired from their job for using the treatment allowed by law when sanctioned by a doctor jeopardizes the clear policy of the act. It will discourage other people in her position from availing themselves of a treatment the voters decided should be available.

¶50 The third element is undisputed: Roe's protected conduct caused her employer to fire her.

¶51 The fourth is best left to a jury. While I am unpersuaded that federal law prohibits Teletech Customer Case Management (Colorado) LLC from following Washington law on this subject, the employer may well have an overriding reason not to permit an employee to medicate with marijuana. Based on the record and briefing before us, I would leave that question to a jury.

¶52 Neither I nor the law would require employers to employ drug-impaired workers. The law is intended to treat marijuana like any other medication. It is well established that employers must "reasonably accommodate a disabled employee unless the accommodation would be an undue hardship on the employer." *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 145, 94 P.3d 930 (2004) (citing *Pulcino v. Fed. Express Corp.*, 141 Wn.2d 629, 639, 9 P.3d 787 (2000)). Quite often, marijuana is used to treat conditions that would qualify as a disability. *Compare* RCW 69.51A.010 (listing some of the qualifying conditions), *with* RCW 49.60.040(7)(a) (defining "disability" for purposes of the Washington Law Against Discrimination, chapter 49.60 RCW). As I read the law, an employer is required only to *reasonably* accommodate the disability through accepting the treatment to the extent such accommodation does not impose an undue hardship. *Riehl*, 152 Wn.2d at 145.

¶53 Unfortunately, Teletech has a drug screening policy that prohibits employees from having any evidence of medical marijuana in the employee's system without regard for

whether the medical marijuana was consumed "on site," whether the medical marijuana affects the employee's job performance, or whether the employer can reasonably accommodate the employee's medical use. This case, along with many others, shows that the act is in need of legislative review. *E.g.*, *State v. Tracy*, 158 Wn.2d 683, 147 P.3d 559 (2006). To that end, I urge the legislature to thoughtfully review and improve the act.

¶54  I respectfully dissent.