86 P.3d 1259 (2004)
STATE of Washington, Respondent,
v.
Misty JUSTESEN, Appellant.
No. 50442-8-I.
Court of Appeals of Washington, Division 1.
April 5, 2004.
*1260 Gregory Link, Cheryl Aza, Washington Appellate Project, Seattle, WA, for Appellant.
Thomas Seguine, Skagit County Prosecutor, Mount Vernon, WA, Kimberly Anne Thulin, Whatcom County Prosecutor, Bellingham, WA, for Respondent.

AMENDED OPINION
BECKER, C.J.
Appellant Misty Justesen concealed her daughter in Massachusetts for 18 months and was convicted of custodial interference. Her defense was a claim that she believed the girl's father was sexually molesting her. Justesen knew the father had passed a polygraph test in which he denied sexual misconduct, and the trial court allowed the jury to consider the polygraph evidence in deciding whether it was reasonable for Justesen to maintain a belief that the father was a molester.
The polygraph is not a reliable indicator of truth for purposes of court proceedings. Because the polygraph evidence was used to prove that the father's denial was truthful, it should not have been admitted without a stipulation. Finding that the error was prejudicial, we reverse the conviction.
Testimony at trial established that KS was the father of a daughter born to Misty Justesen in 1994. They soon separated, and informally arranged to share parenting responsibilities. KS initiated a paternity action.
Before the child was three years old, Justesen had her examined for signs of sexual abuse several different times. The examinations were inconclusive. Justesen reported to local police and Child Protective Services that she suspected KS of molesting the child. These agencies investigated but found Justesen's suspicions to be unsubstantiated.
A temporary court order issued when the child was three years old provided for Justesen and KS to share custody on an alternating weekly basis. Their relationship remained acrimonious. In summer of 1999, shortly after meeting with a court-appointed mediator in regard to the need for a permanent parenting plan, Justesen took her daughter and left the state. A police investigation located the two of them 18 months later in Massachusetts, where they were living under assumed names.
The State charged Justesen with one count of custodial interference in the first degree.[1] A jury found Justesen guilty as charged.

THE POLYGRAPH RULING
The primary issue on appeal is whether the court erred in admitting evidence that KS passed a polygraph examination when the police were investigating him.
Before trial, Justesen moved to exclude any evidence regarding the polygraph examination or its results. She also served notice of her intent to present a statutory defense. A defendant who can prove by a preponderance *1261 of the evidence that, among other things, she reasonably believed the child was in danger of imminent physical harm, has a complete defense to a charge of custodial interference. RCW 9A.40.020(2)(a).
Ordinarily, evidence that a polygraph test has been taken or passed is inadmissible absent stipulation by both parties because the polygraph has not attained general scientific acceptability. State v. Descoteaux, 94 Wash.2d 31, 38, 614 P.2d 179 (1980), overruled on other grounds, State v. Danforth, 97 Wash.2d 255, 643 P.2d 882 (1982). In deciding to admit the polygraph evidence without a stipulation, the trial court relied on State ex rel. Taylor v. Reay, 61 Wash.App. 141, 810 P.2d 512, review denied, 117 Wash.2d 1012, 816 P.2d 1225 (1991).
Reay, a civil case, arose from a mandamus action brought by parents who believed their daughter had been murdered by her husband. They sought to compel a medical examiner to change his determination that the young woman's death had been a suicide. The issue for the jury was whether the examiner had acted arbitrarily and capriciously in classifying the death as a suicide. Over the parents' objection, the jury was permitted to learn that the evidence considered by the examiner during his investigation included the results of the husband's polygraph test indicating that he was being truthful when he denied causing the death. The trial court believed it would be improper and artificial not to allow the jury to hear that the examiner considered this evidence. The evidence came in with a limiting instruction, cautioning that the polygraph was not sufficiently reliable to be an indicator of truthfulness in court proceedings. "However, the polygraph is used by law enforcement as an investigatory tool and you may consider its use here in evaluating the conduct and investigation carried out by the Medical Examiner." Reay, 61 Wash.App. at 148, 810 P.2d 512.
The Reay jury brought in a verdict deciding that the examiner did not act arbitrarily or capriciously. The reviewing court, affirming the verdict, concluded that admission of the polygraph evidence was not an abuse of discretion because it was offered to prove that the examiner was thorough, not to prove that the husband was innocent. The potential for prejudice "was negligible in light of the purpose for which the polygraph was admitted, as well as the limiting instruction given to the jury." Reay, 61 Wash.App. at 150, 810 P.2d 512.
Viewing the present case as analogous to Reay, the trial court stated that the prosecutor
is not offering the polygraph to convince the jury that [KS] did not sexually assault his daughter. He is offering it to show that it is another piece of information which Miss Justesen should have considered and which should have helped to convince her that there was no sexual assault going on. In other words, it goes to the reasonableness of her belief in this danger to the child, doesn't it?[[2]]
The court decided the evidence would be admissible, with a limiting instruction, "because it was something that was told to Miss Justesen and something which she should have considered in making her determination".[3]

THE TRIAL
The State's case in chief quickly established the elements of the charge by showing KS was entitled by court order to have custody of the child, and that Justesen disappeared with the child and kept her in another state for a protracted period of time.
Justesen, testifying in her own defense, described the events that led her to believe KS was sexually abusing the child. She said that after returning from her stays with KS, the child would resist washing her genital area, her genitals were red and irritated, she uncharacteristically wet her pants, and appeared to be traumatized. She described this behavior as ongoing from 1996 through 1999. She testified that the child, at age two and a half, came up to her with a stick and said "I'm going to put this in your hole ... *1262 it's okay, it won't hurt you".[4] On one occasion the child reportedly said her father gave her cake "when I let him fingernail me."[5] On another occasion, while taking a bath, the child reportedly told Justesen "daddy ... puts oil on his pee-pee and massages inside me".[6] A woman who lived with Justesen at the time testified that she too overheard the child make this statement.
A pastor with a local women's shelter testified that the child returned from a visit with KS and appeared to have some sort of discharge in her underwear. She said she advised Justesen to take the girl to the emergency room for a sexual assault examination. The emergency room pediatrician who examined the child at that time testified that he observed a small red spot on the girl's labia and noted that her hymenal opening was a little larger than normal. The doctor said that given the mother's fears of sexual abuse, he too was concerned. He checked the child for indications of semen, but found none. Justesen also told the jury about an incident when she saw what she described as a "bloody tear" on the child's labia. According to Justesen, the girl told her that "dad put his face in her bottom."[7]
Justesen and her former housemates testified that the child was reluctant to go to the residence of KS and would appear upset upon coming back. Justesen's former boyfriend described the child as being non-communicative, withdrawn, "floppy"[8], and having frequent nightmares on these occasions. Justesen said she considered these behaviors to be additional signs of ongoing sexual abuse.
The topic of the polygraph test first emerged during Justesen's testimony on direct examination. She explained that in January 1997, she refused to turn her daughter over to KS for a visit because of her concerns about sexual abuse. She said the police responded to this incident by telling her KS had passed a polygraph examination and that she must comply with the parenting schedule. She said she again spoke to police about her fears in October 1997. According to Justesen, the officer "mentioned the polygraph and he mentioned all that had been done to investigate the case and he was saying that they've done what they can."[9]
The prosecutor's cross-examination of Justesen implied that she was unreasonable in being unwilling to accept the results of the polygraph:
[The prosecutor]: What do you know about polygraphs?
[Justesen]: Not much.
[The prosecutor]: You got that information, though, and you were willing to disregard it; is that correct?
[Justesen]: I turned her over and I never stopped believing my child over a polygraph or two or three vague questions that could have been construed in one's mind in one way or the other.
...
[The prosecutor]: At that point in time you realized that it was something that might indicate that [KS] was being truthful?
[Justesen]: I did not regard the polygraph. I complied with Detective Johnston's orders as well as the judge's and I never stopped believing my daughter.
[The prosecutor]: You've never run into somebody who had been subjected to a polygraph; isn't that correct?
[Justesen]: No.
[The prosecutor]: And you were aware of the fact that [KS], as soon as he learned of the new allegations, volunteered to take the polygraph?
[Justesen]: Yes.
[The prosecutor]: In fact, as soon as he became aware of them, it was just a matter *1263 of days before he reported to the Bellingham Police Department and subjected himself to that?
[Justesen]: Apparently.
[The prosecutor]: And you realize that was in fact the Bellingham Police Department that administered the polygraph?
[Justesen]: Yes.
[The prosecutor]: And did you have any reason to believe that it had been administered by anyone other than a trained polygraph examiner?
[Justesen]: No because I was informed by Detective Johnston that he had passed and therefore
...
[The prosecutor]: So you didn't have any reason to believe that the process which was followed in administering the polygraph was flawed?
[Justesen]: I had reasons to believe that it was.
[The prosecutor]: That the process which was followed in administering the polygraph was flawed?
[Justesen]: It was sometime later that I read the questions on the polygraph and I didn't believe that they addressed probable cause.[[10]]
The State presented a number of rebuttal witnesses, including Detective Hutchings, the polygraph examiner for the Bellingham Police Department. Hutchings testified to his training and experience in administering polygraph examinations. He explained how the polygraph equipment works, describing at length the method of questioning and how it is used to evaluate the truthfulness of the subject. He testified that computer analysis of the polygraph charts reported "as low a probability of deception as the computer program chart evaluations will allow."[11] The trial court admitted the computer-generated report as an exhibit over Justesen's objection.
The State completed its rebuttal case with testimony by KS. He described incidents that suggested Justesen was making up allegations of sexual abuse in order to avoid having to cooperate with him in a parenting plan. The last two questions the prosecutor asked KS went directly to whether the allegations of sexual abuse were true: "Have you ever put your hand on [the child's] vaginal area for sexual gratification?" and "Have you ever, for other than parental reasons, touched [the child's] vaginal area?" KS answered "No" to both questions.[12]
The prosecutor did not mention the polygraph in the initial closing argument. Justesen, in her closing statement, argued that the evidence of past sexual abuse supported a finding that at the time she left with her daughter, she had a reasonable fear that further sexual abuse was imminent. The prosecutor in rebuttal acknowledged that "the heart of the case"[13] lay in whether or not KS had actually had sexual contact with his daughter. The prosecutor, summarizing the evidence at length, argued that it cast doubt on Justesen's motives and showed KS to be credible when he denied committing acts of sexual abuse.
The polygraph, the prosecutor claimed, "is a tool, is something that can be used to sort of decide whether someone is telling the truth."[14] The prosecutor reminded the jury that KS voluntarily and promptly subjected himself to the polygraph examination, and the results unambiguously showed no deception. Justesen, the prosecutor argued, unreasonably disregarded this information:
The very next morning [KS] is down there, he's got his arms hooked up to the wires of this thing, the indignity of this is amazing but it shows the humbleness of this man, the willingness of this man to do whatever he needs to do to try to clear his name.

*1264 ...
But when we get to this part of the case, Miss Justesen would have you believe that it's meaningless, that's what she testified to, it doesn't mean a darn thing. So what that the guy goes down and takes a polygraph. Everybody knows people can fail polygraphs. Well, why wouldn't Miss Justesen as a reasonable person, that's what she wants you to believe, she's a reasonable person, what would be so hard about finding out a little bit more? What would be so hard about calling up Detective Hutchings and saying gosh ... I have had the child in for ... all these things, that is ambiguous, what did you do? What did you ask him? What did he say? Isn't it possible that maybe if I learned some more about this I will be able to understand the situation? But she would have none of it and this is a great example about how she's very consciously disregarding information and that goes into your equation of reasonable. What she says is good liars can pass it anyway.[[15]]
The prosecutor asked the jury to conclude, based on all the evidence, that "there was no real true belief in harm going on to the child."[16]
The jury brought in a verdict of guilty. This appeal followed.

DISCUSSION
The State argues that because Justesen was first to elicit evidence of KS's polygraph test, she waived the right to complain of it on appeal. This argument fails. Waiver is the voluntary relinquishment of a right. "A defense lawyer who introduces preemptive testimony only after losing a battle to exclude it cannot be said to introduce the evidence voluntarily." State v. Vy Thang, 145 Wash.2d 630, 648, 41 P.3d 1159 (2002). Having preserved the issue through her unsuccessful pretrial motion, Justesen was entitled to introduce the evidence herself as a preemptive strategy.
Polygraph evidence is liable to be prejudicial and therefore should be admitted only when clearly relevant and unmistakably nonprejudicial. Descoteaux, 94 Wash.2d at 38-39, 614 P.2d 179. The prejudicial effect of polygraph evidence in a criminal prosecution is illustrated in a murder case, State v. Sutherland, 94 Wash.2d 527, 617 P.2d 1010 (1980). Brian Gjerde, the State's principal witness against the defendant, was initially the prime suspect in the investigation of the murder at issue. Defense cross-examination of the investigating officer raised questions about the quality of the officer's work on the case and implied he had not been thorough in his investigation of Gjerde. Over the defendant's objection, the State was allowed to elicit on redirect the officer's testimony that he had given Gjerde two lie detector tests during the course of the investigation.
The reviewing court reversed the conviction on the basis that the polygraph evidence impermissibly fortified the testimony of the witness. Sutherland, 94 Wash.2d at 530, 617 P.2d 1010. "The jury could scarcely conclude other than that Gjerde was telling the truth and that the police investigators believed him.... The error was compounded by the prosecution's reference to the polygraph tests during its closing argument." Sutherland, 94 Wash.2d at 531, 617 P.2d 1010.
The State, arguing that Reay rather than Sutherland is the applicable precedent, compares Justesen to the medical examiner in Reay who considered polygraph evidence along with many other pieces of evidence before deciding that the decedent was not a murder victim. But this is not a case where the central issue was the thoroughness of a professional investigation. Like Sutherland, it is a criminal case where the ultimate issue was guilt. KS was a critical witness against Justesen and the jury had to decide whether or not he was telling the truth. An obvious inference was that KS, by taking the polygraph, had satisfied police investigators that he was not guilty of child molestation. This inference strongly, and impermissibly, fortified his testimony.
*1265 The court attempted to neutralize the polygraph evidence by giving the following limiting instruction:
You have heard testimony concerning the use of a polygraph in this case. There is scientific dispute about the reliability of the polygraph. The polygraph is not generally accepted in the scientific community as reliable.
Based on the current scientific data supplied to the court of this state, the polygraph has not been shown to be sufficiently reliable as an indicator of truthfulness to be admissible in court proceedings.
However, the polygraph is used by law enforcement as an investigatory tool and you may consider its use here in evaluating the conduct and investigation carried out by law enforcement. You may also consider it in evaluating the reasonableness of the defendant's beliefs.
You are instructed that the result of the polygraph of [KS] may not be considered as reliable evidence that [KS] did or did not subject [his daughter] to sexual abuse.
You may accept or reject the polygraph evidence in whole or in part in accordance with your views as to the persuasive character of that evidence.[[17]]
The limiting instruction was ineffective. It told the jury not to consider the polygraph as reliable evidence that KS did or did not commit sexual abuse, but at the same time it explicitly invited the jury to consider the polygraph in evaluating the reasonableness of Justesen's belief. These two messages were inconsistent. The jury's evaluation of the reasonableness of Justesen's belief, as the State's argument recognized, depended in large part on their evaluation of whether KS was credible when he denied having sexual contact with his daughter. As the Reay court recognized, polygraph evidence cannot be used to establish that one party's version of events is the truth:
If the polygraph evidence is being introduced because it is relevant that a polygraph was administered regardless of the results, ... then the polygraph evidence may be admissible as an operative fact. If, on the other hand, the polygraph evidence is offered to establish that one party's version of the events is the truth, the polygraph evidence is being introduced for its substantive value and is inadmissible absent a stipulation....
Reay, 61 Wash.App. at 149-50, 810 P.2d 512 (quoting Brown v. Darcy, 783 F.2d 1389, 1397 (9th Cir.1986)).
We conclude the trial court abused its discretion in admitting the polygraph evidence.
As in Sutherland, the prejudice was compounded by the State's cross-examination and closing argument. The limiting instruction inspired the prosecutor to argue that the polygraph can be used to decide whether someone is telling the truth. This is exactly what the law rejects. Polygraph evidence is inherently unreliable as an indicator of deception. Inherently unreliable evidence is not relevant, and this "is especially true where the evidence is as seductive as the polygraph; a machine that purports to test truthfulness." State v. Ahlfinger, 50 Wash. App. 466, 472-73, 749 P.2d 190, review denied, 110 Wash.2d 1035, 1988 WL 632428 (1988).
The State suggests that Justesen exacerbated the prejudice of which she now complains, by eliciting unnecessary details about the mechanics of the polygraph. But the bare fact that KS took and passed the polygraph test was the primary source of prejudice; once that information was in, it would have been very difficult to minimize. Having procured the improper admission of polygraph evidence over Justesen's objection, the State is not in a position to argue that she caused the prejudice.
An evidentiary error which is not of constitutional magnitude requires reversal only if the error, within reasonable probability, materially affected the outcome. State v. Halstien, 122 Wash.2d 109, 127, 857 P.2d 270 (1993). In this case the error was not harmless. Justesen and other witnesses reported observing troubling behavior and comments *1266 by the child. Medical professionals and other investigators took the allegations seriously despite the lack of conclusive physical evidence. The State did present sufficient evidence apart from the polygraph tending to rebut Justesen's defense. For example, the child told a therapist her father had not molested her, and "my mom thinks my dad did. But he didn't."[18] But much of this evidence involves credibility determinations or is circumstantial, and we cannot be sure that the jury would have rejected Justesen's defense if the polygraph evidence had not come in. Under these circumstances, there is a reasonable probability that the admission of the polygraph evidence materially affected the outcome of the trial.
Justesen raises a number of issues pro se. To the extent that she challenges the sufficiency of the evidence to convict, we find the evidence sufficient. It is unnecessary to reach the other issues at this time.
Reversed and remanded for a new trial.
BAKER and COLEMAN, JJ., concur.
NOTES
[1] The State charged Justesen with custodial interference in violation of RCW 9A.40.060(2)(a) and (2)(c). Custodial interference in the first degree occurs when a person takes, entices, retains, detains, or conceals a child from a parent, guardian, institution, agency, or other person having a lawful right to physical custody with the intent to deny access and either (a) Intends to hold the child or incompetent person permanently or for a protracted period; or ... (c) Causes the child or incompetent person to be removed from the state of usual residence. RCW 9A.40.060(2)(a), (c).
[2] Verbatim Report of Proceedings, March 4, 2002 at 11.
[3] Verbatim Report of Proceedings, March 4, 2002 at 19-20.
[4] Verbatim Report of Proceedings, March 8, 2002 at 254.
[5] Verbatim Report of Proceedings, March 8, 2002 at 261.
[6] Verbatim Report of Proceedings, March 8, 2002 at 254.
[7] Verbatim Report of Proceedings, March 8, 2002 at 321.
[8] Verbatim Report of Proceedings, March 6, 2002 at 56.
[9] Verbatim Report of Proceedings, March 8, 2002 at 324.
[10] Verbatim Report of Proceedings, March 11, 2002 at 489-91.
[11] Verbatim Report of Proceedings, March 14, 2002 at 855.
[12] Verbatim Report of Proceedings, March 15, 2002 at 1120.
[13] Verbatim Report of Proceedings, March 18, 2002 at 1211.
[14] Verbatim Report of Proceedings, March 18, 2002 at 1241.
[15] Verbatim Report of Proceedings, March 18, 2002 at 1242-43.
[16] Verbatim Report of Proceedings, March 18, 2002 at 1261.
[17] Instruction 12; Clerk's Papers at 62.
[18] Verbatim Report of Proceedings, March 14, 2002 at 880.