# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| ROBERT PIEL and JACQUELINE PIEL, husband and wife, | ) ) ) | NO. 72707-9-I |
| Respondents, | ) ) ) | DIVISION ONE |
| v. | ) ) | |
| THE CITY OF FEDERAL WAY, a municipality organized pursuant to the laws of the State of Washington, | ) ) ) ) | UNPUBLISHED OPINION |
| Appellant. | ) ) ) | FILED: May 16, 2016 |

LAU, J. — The Federal Way Police Department terminated Robert Piel after he made comments about murdering other Department members. He appeals a jury verdict that rejected his wrongful discharge claim based on alleged public policy violations. Piel challenges numerous trial court rulings on exclusion and admission of evidence. He also challenges the partial summary judgment order that limited the public policy sources for his wrongful discharge claim. Because the trial court's evidence rulings fall well within its broad discretion and it properly granted partial summary judgment, we affirm the judgment entered on the jury's verdict.

FACTS[1]

Piel worked for the Federal Way Police Department for nearly 11 years, as an officer and then as a lieutenant. In May 2006, Chief Anne Kirkpatrick terminated Piel for misconduct when Piel directed a subordinate officer to release a firefighter detained on suspicion of drunk driving. Piel successfully grieved his termination through arbitration. He contended the Department lacked just cause to terminate him and that his termination was motivated by anti-union bias.

From 2002 to 2005, Piel spearheaded an effort to unionize the lieutenants in the Department. Piel claimed the Department retaliated against him in various ways. Piel noticed "a marked increase in his duties and responsibilities without commensurate support [and] unusual and obstreperous internal affairs investigations." Piel, 177 Wn.2d at 607-08. Piel argued this retaliation ended with his termination. The arbitrator concluded that although just cause existed to discipline Piel, the Department did not meet its burden of proof on discharge. The arbitrator ordered the Department to reinstate Piel in a demoted capacity and reimburse him for all lost pay and benefits.

In August 2007—nearly 13 months after his termination—Piel returned to work. On his first day back, Piel made several questionable comments. For example, Piel asked one newlywed officer, who he had not met, if her husband was ugly and if they planned to have kids. She testified that the comments made her uncomfortable and that she did not want to answer Piel because she did not know him: "I was so hot, sweaty, embarrassed, uncomfortable, enraged, and disgusted that I threw my chair

_____

[1] For a summary of background facts, see Piel v. City of Federal Way, 177 Wn.2d 604, 306 P.3d 879 (2013).

back and stated, 'Are we done?' I then walked out of the briefing room feeling completely helpless and furious." Exhibit (Ex.) 4, tab 11; see also Report of Proceedings (RP) (Oct. 21, 2014) at 69-70.[2] One officer stated that Piel's behavior approached conduct unbecoming of an officer.

Witnesses heard Piel make some threatening statements after a unit briefing. Jail Coordinator Jason Wilson and two other officers testified that Piel said he had thought about "murdering" people in the department. Wilson reported Piel's comments to his superior the next day. The Department assigned Commander Steve Arbuthnot to conduct a formal disciplinary investigation of the incident.

Two other officers heard Piel make the threatening statements. Officer Brian Bassage provided a written statement that corroborated Wilson's testimony. During an interview with Arbuthnot, Officer Bassage expressed some concern about the statement, but viewed it as not a serious threat. Officer Jason Ellis also heard the comments but assumed Piel was joking. Officer Ellis reiterated this belief in his interview with Arbuthnot.

About one month after the "murder" comment, Arbuthnot interviewed Piel. Piel repeatedly denied making the comment. Ex. 4, tab 23. Piel offered to take a polygraph test, and Arbuthnot responded, "Okay." Ex. 4, tab 23. Officer Keith Pon, a Police Officer's Guild representative present at the interview, did not object. Arbuthnot received an e-mail from Piel containing the polygraph test results. The collective

---

[2] One officer who witnessed this incident provided this statement: "Piel went on to talk with [female officers] Schroll and Scheyer. It was mentioned that Scheyer recently got married. Piel asked Scheyer if her husband was a cop or if he was ugly . . . I could sense they were upset." Ex. 4, tab 9.

bargaining agreement between the City and the Police Officer's Guild expressly prohibits polygraph evidence in disciplinary proceedings unless both parties stipulate to its admission: "Nor shall polygraph evidence of any kind be admissible in disciplinary proceedings, except by stipulation of the parties to this [a]greement." Ex. 99 at 20. Police Officer's Guild President John Clary declined to stipulate. Because Arbuthnot reviewed the polygraph evidence, the City reassigned the investigation to an independent investigator to avoid any improper influence. Arbuthnot explained the reassignment in the summary report he provided to the City:

> Officer Piel's comments referring to the work place violence concerns have been assigned by the City to an independent investigator due to Officer Piel sending me [polygraph test results]. The Police Officer's Guild Collective Bargaining Agreement prohibits the introduction of [this] information in a disciplinary investigation unless stipulated to by the Guild and the City. No such stipulation existed at the time the [polygraph test results were] forwarded to me and the Guild refused to stipulate throughout this investigation.

Ex. 4 at 2.

The City retained attorney Amy Stephson to continue the investigation. The City provided Stephson with Arbuthnot's report and the statements and interviews he had collected. Stephson interviewed Piel and the three who heard the threatening comments—Bassage, Wilson, and Ellis. Piel continued to deny he made threats. Stephson's final report concluded that Piel "did make a comment to the effect that he had thought of murdering others with his gun at some point or points during the 15-month period he was absent from the police department." Ex. 9 at 2. Stephson also concluded that Piel's comment violated section 10.6 of the employee guidelines. Section 10.6 prohibits employees from "threatening injury or damage against a person

-4-

or property." Ex. 9 at 3. It further states that "[b]ecause of the potential for misunderstanding, joking about any of the above misconduct is also prohibited." Ex. 9 at 3.

Stephson also found Piel's testimony not credible for two reasons. First, three witnesses contradicted Piel's repeated denials about the "murder" comment. Ex. 9 at 3. Second, Piel also denied making negative comments that other witnesses heard and testified about, such as the comments directed at the female officers and his comments about former Chief Kirkpatrick. "When asked about these other comments, Piel either denied them outright, denied making them at the briefing, or couldn't remember them. This suggests that he either has little recollection of what he said during that conversation, or decided to deny making any comments that were arguably negative. In either event, his credibility is not enhanced." Ex. 9 at 3.

Professional Standards Commander Melanie McAllester is responsible for reviewing internal investigations and recommending discipline to the Chief. Commander McAllester concluded that Stephson's report sustained allegations of workplace violence (threats) and untruthfulness against Piel. She recommended that Piel be terminated for each violation. On January 31, 2008, Chief Brian Wilson issued a letter of discharge to Piel.

In 2008, the Piels sued the City of Federal Way. They alleged wrongful discharge in violation of public policy. Piel argued the Department terminated him for engaging in union-organizing activities protected by RCW 41.56.040. In October 2009, a superior court judge granted the City's motion to dismiss and motion for summary judgment. The trial court ruled that Piel could not satisfy the "jeopardy" element of his

wrongful discharge claim because the remedies available through the Washington Public Employee Relations Commission (PERC) adequately protected the public policy grounded in RCW 41.56. The Supreme Court reversed and remanded on direct review. It held that Piel could pursue his wrongful discharge claim despite the administrative remedies available through PERC.

Piel alleged on remand that several activities he engaged in during his employment constituted protected activities for purposes of a wrongful discharge claim. These activities included (1) formation of the Lieutenant's union in accordance with RCW 41.46, (2) several administrative actions such as filing a complaint pursuant to the Employee Guidelines for Employees of the City of Federal Way, (3) filing a claim for damages with the City under RCW 4.96.020.

The City successfully moved for summary judgment on two issues. First, the trial court concluded that Piel was collaterally estopped from arguing that his 2006 termination was motivated by anti-union animus. At the arbitration hearing following his 2006 termination, Piel argued that the termination constituted retaliation for engaging in union-organizing activities. The arbitrator rejected this argument and concluded just cause existed. Because the issue was previously litigated and determined during arbitration, the trial court ruled that collateral estoppel barred Piel's claim that his 2006 termination was retaliation for engaging in union activities.

Second, the trial court ruled that actions authorized by the employee guidelines and submitting a notice of claim for damages under RCW 4.96.020, were not protected activities for purposes of a wrongful discharge claim. The trial court granted the City's motion for summary judgment as to those claims. The Piel's only remaining claim was

that his 2008 termination amounted to wrongful discharge in violation of public policy protected under RCW 41.56. After an 8-day trial, the jury rejected Piel's wrongful discharge in violation of public policy claim. Piel appeals various evidence rulings and the partial summary judgment order.

## ANALYSIS

### Standard of Review

We will reverse a trial court's evidentiary rulings only upon a showing of abuse of discretion. Subia v. Riveland, 104 Wn. App. 105, 113-14, 15 P.3d 658 (2001). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). Further, even if a trial court's evidentiary rulings were erroneous, the appellant must also show that the error was prejudicial. "Error will not be considered prejudicial unless it affects, or presumptively affects, the outcome of the trial." Brown v. Spokane Cnty. Fire Prot. Dist. No. 1, 100 Wn.2d 188, 196, 668 P.2d 571 (1983).

### Exclusion of Polygraph Evidence

Piel claims the trial court erred when it excluded evidence that he "had taken and passed a polygraph." Br. of Appellant at 20. The trial court properly ruled that the polygraph evidence was more prejudicial than probative.[3] The collective bargaining agreement also prohibits polygraph evidence absent a stipulation by the parties. Piel

---

[3] Piel failed to endorse any expert witness to lay any foundation for the admission of the polygraph evidence. His claim that the evidence was not offered for its truth is undermined by his arguments at trial and on appeal.

-7-

has failed to show that the trial court abused its discretion when it excluded the polygraph evidence.

Generally, courts exclude polygraph evidence due to its unreliability and the powerful effect it can have on juries. "[E]vidence that a polygraph test has been taken or passed is inadmissible absent stipulation by both parties because the polygraph has not attained general scientific acceptability." State v. Justesen, 121 Wn. App. 83, 86, 86 P.3d 1259 (2004).[4] Because "[p]olygraph evidence is liable to be prejudicial," it "should be admitted only when clearly relevant and unmistakably nonprejudicial." Justesen, 121 Wn. App. at 93.

Piel contends the polygraph evidence was admissible because it was introduced not for its substantive truth but to show the Department's bias against him.[5] Under limited circumstances, polygraph evidence may be admitted for purposes other than its substantive truth:

> If the polygraph evidence is being introduced because it is relevant
> that a polygraph was administered regardless of the results, . . . then the
> polygraph evidence may be admissible as an operative fact. If, on the
> other hand, the polygraph evidence is offered to establish that one party's

---

[4] "The Washington courts have never directly and squarely addressed the question of whether the [polygraph evidence] rules applicable to criminal cases apply with equal force and effect in civil cases, or whether the courts should be more receptive to polygraph evidence in civil cases. The few reported cases on point suggest that the same ground rules applicable in criminal cases apply in civil cases as well." 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 702.40, at 158 (5th ed. 2007).

[5] Piel also argues the polygraph evidence was relevant to show his "state of mind" when Stephson interviewed him. Specifically, Piel claims that polygraph shows that he in good faith did not believe he made the "murder" comments and therefore did not intentionally deceive Stephson. But Piel's state of mind was not a relevant issue here. The DOC's state of mind was relevant in Subia because the main issue in that case was whether the disciplinary action was motivated by racial discrimination. Subia, 104 Wn. App. 114.

version of the events is the truth, the polygraph evidence is being introduced for its substantive value and is inadmissible absent a stipulation.

State v. Reay, 61 Wn. App. 141, 149-50, 810 P.2d 512 (1991) (quoting Brown v. Darcy, 783 F.2d 1389, 1397 (9th Cir. 1986)).

Piel cites Subia. The Department of Corrections (DOC) relied on the polygraph results as a reason for placing Subia on administrative leave without pay due to alleged sexual misconduct. The evidence was not offered to show whether Subia engaged in misconduct. As the court of appeals observed, the polygraph evidence "was highly relevant" as to whether the DOC's reason for the discipline was false. Subia, 104 Wn. App. at 114. This bears directly on the employer's motive for its disciplinary action, a central issue in Subia's race discrimination trial. Piel argues the polygraph evidence is admissible because whether or not he made the "murder" comments is not as important as the fact that the test was taken and the Department's reaction to it.

Unlike in Subia, the polygraph evidence here offered no direct evidence on a central claim or defense. The polygraph evidence in Subia was a primary factor in the DOC's nondiscriminatory decision to place Subia on administrative leave. Subia, 104 Wn. App. at 115. The marginal relevance of Piel's polygraph evidence is clear. Piel claimed that he was terminated for illegitimate reasons. The investigation into Piel's misconduct was already well underway when Piel sent Arbuthnot the polygraph results. Arbuthnot had already collected statements from several other officers attesting to Piel's conduct. Piel argued he was terminated due to his involvement in forming the union in the early 2000s and his successful arbitration in 2007. The polygraph evidence was not central to his claims. He presented his theory of the case without it. Piel's theory at trial

focused on the Department's alleged retaliatory discharge based on his effort to form a lieutenant's union in the early 2000s. As proof of this, he presented evidence on onerous and unusual changes to his employment, including a transfer out of a specific unit, assignment of additional duties without commensurate support, poor performance reviews, and several standards investigations led by Greg Wilson, the brother of former Deputy Chief Brian Wilson. Piel's attorney claimed that the evidence would "demonstrat[e] a pattern of animus" culminating in Piel's termination. RP (Oct. 13, 2014) at 209. But the polygraph evidence was not directly relevant to this "pattern." For example, Piel argues the polygraph evidence is relevant because it supports the inference that Chief Wilson removed Arbuthnot from the investigation because Arbuthnot was leaning towards clearing some of the charges against Piel. But the record shows that Piel was able to make the same argument without the polygraph evidence:

> So, Commander Arbuthnot—and this is very important—tells Bud [Piel], and it's on the record, that he's 'decided that—that four of the five charges are unsubstantiated.' He's gonna dismiss 'em. He interviews Bud Piel and the very next day Chief Wilson pulls him off the investigation. Hires an outside investigator.

RP (Oct. 13, 2014) at 222-23.

The City also properly declined to consider the polygraph evidence due to the collective bargaining agreement's stipulation requirement. As discussed above, the Federal Way Police Officers' Collective Bargaining Agreement expressly prohibits consideration of polygraph evidence in disciplinary matters absent stipulation by the City and the union. Arbuthnot's final report correctly notes that "no such stipulation existed

at the time the [polygraph evidence was] forwarded to me and the Guild refused to stipulate throughout this investigation." Ex. 4 at 2.[6]

Piel fails to present any evidence of a binding stipulation. He claims instead that members of the Guild never objected and that the Guild representative's silence during Piel's interview with Arbuthnot amounts to a stipulation. He also points to an e-mail comment from Guild President John Clary about some information missing from the file for the Piel investigation, including the polygraph evidence. Arbuthnot claims John Clary declined to consent to Piel's polygraph evidence. Neither the union representative's silence nor Clary's e-mail constitute an affirmative stipulation. It is also questionable whether Arbuthnot and the Guild representative were authorized to bind the City and the union to such a stipulation. We are not persuaded by Piel's stipulation claims. Piel does not dispute that the department was precluded from using the polygraph evidence in Piel's disciplinary proceeding under the Collective Bargaining Agreement's stipulation requirement.[7]

The trial court's decision to exclude the polygraph evidence does not amount to an abuse of discretion. See Industrial Indem. Co. of the Northwest, Inc. v. Kallevig, 114 Wn.2d 907, 926, 792 P.2d 520 (1990) ("A trial court has broad discretion in performing

---

[6] The Guild has consistently refused to allow polygraph evidence since the collective bargaining agreement was amended in 2001.

[7] Piel argues that the City could have introduced all the evidence justifying their reasons for not considering the polygraph evidence had it been admitted. Piel contends that the trial court could have admitted the polygraph evidence and then the City could have presented evidence explaining its decision not to consider the polygraph evidence—the collective bargaining agreement, the conversation with Guild President Clary, etc. The jury could decide whether the Department's decision to ignore the polygraph evidence was motivated by improper bias. Piel misses the point. The threshold question on the polygraph's admissibility rests with the trial court, not the fact finder.

the balancing test contemplated in ER 403 and will be reversed only upon a showing of abuse of discretion."). This is especially true for polygraph evidence, which "is liable to be prejudicial and therefore should be admitted only when clearly relevant and unmistakably nonprejudicial." Justesen, 121 Wn. App. at 93 (emphasis added). Given the polygraph evidence's limited probative value and its potential for prejudice, the trial court did not abuse its discretion when it excluded the evidence.

Even if we assume the trial court erred when it excluded the polygraph evidence, Piel fails to show prejudice. Thomas v. French, 99 Wn.2d 95, 659 P.2d 1097 (1983) ("Error without prejudice is not grounds for reversal, and error will not be considered prejudicial unless it affects, or presumptively affects, outcome of trial."). Piel was fired for two independent reasons: he threatened workplace violence and then lied about it.[8] Even if we assume the polygraph evidence was relevant to show Piel was not dishonest when he denied making the threat, that evidence does not affect the Department's legitimate motive to terminate Piel based on workplace violence by a police officer. The

---

[8] Commander McAllester's recommendation provides:

**Workplace violence:** Officer Piel did not simply threaten to harm another; his statement was to end another's life. He is a police officer and must understand the seriousness of such a statement, especially given the circumstances. His position provides him the means of carrying out his threat. *I recommend that Officer Piel be terminated for this sustained violation.*

**Untruthfulness:** An independent investigator determined that the City could reasonable conclude that Officer Piel was dishonest during the investigation when he uncategorically denied making the statement. His dishonesty prevents him from continuing in a profession that demands honesty, credibility, and integrity from those entrusted to protect the community and enforce the laws. *I recommend that Officer Piel be terminated for this sustained violation.*

Ex. 12 at 4.

trial court properly excluded the polygraph evidence and Piel shows no prejudice from its exclusion.

Whether the City used the Polygraph Ruling "As a Sword"

Piel argues that the City improperly used the trial court's ruling excluding the polygraph evidence. He claims the trial court permitted the City to "invent" facts related to the polygraph test and "open the door"[9] to the polygraph evidence without similarly allowing Piel to rebut the City's claims or discuss that evidence. After it ruled in limine to exclude the polygraph evidence, the court made it clear that Piel was permitted to examine Arbuthnot and the other witnesses about the polygraph evidence provided by Piel and why the investigation was transferred to Stephson, so long as no one mentioned the polygraph: "[y]ou're entitled to ask [Arbuthnot] and cross him on the issue [of his removal] without . . . disclosing what the information was." RP (Oct. 20, 2014) at 189. "We're gonna go with what's been redacted . . . I'd caution both parties not to use the polygraph, given my ruling earlier . . . I have made it very clear that . . . no evidence regarding the polygraph or taking the polygraph or the results of the polygraph will be admissible." RP (Oct. 15, 2014) at 199. When the parties failed to reach an agreement on what substitute term to use for "polygraph," consistent with the court's ruling, the City used the term "information" when referring to the polygraph evidence during trial. It also

---

[9] This assignment of error does not implicate "the open door" doctrine. The doctrine involves the introduction of inadmissible evidence, not admissible evidence. If the City and its witnesses had actually used the term "polygraph," arguably the door is opened. But even then, the trial court has a measure of discretion to decide when the door is opened. See 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.14 (5th ed. 2007) ("Waiver of objections—'Opening the door"). We also note that Piel never objected at any time to the City's use of the substitute term "information."

-13-

ensured all references to "polygraph" were redacted from the trial documents and exhibits. Piel does not complain that witnesses violated the trial court's in limine ruling. For example, during its opening statement, the City explained that Chief Wilson replaced Arbuthnot after he discovered "information" that tainted the investigation:

> When, uh, Commander Arbuthnot opened that e-mail he realized that it was something that under the contract—the collective bargaining agreement—with Officer Piel's union, he's not allowed to look at that information and consider it in the investigation unless the union stipulates or agrees to that. Commander Arbuthnot had a conversation with John Clary, who's the president of the union, who said, "No way. You cannot use that."

RP (Oct. 13, 2014) at 233-34 (emphasis added). And Chief Wilson testified that "there was information that was provided by Mr. Piel that, uh, compromised the integrity of the investigation." RP (Oct. 16, 2014) at 63 (emphasis added). Arbuthnot gave similar testimony using the term "information." RP (Oct. 20, 2014) at 187-90.

The trial court applied its polygraph ruling equally to both parties. It allowed each party the same latitude to examine witnesses and present exhibits as long as the evidence complied with the court's in limine ruling. The court's ruling did not prevent Piel from eliciting relevant evidence on the issues relevant to his claims.

We find no error based on the trial court's polygraph ruling.

Jason Wilson's Deviant Behavior

Piel argues the trial court erred when it prohibited him from eliciting testimony regarding Jail Coordinator Jason Wilson's deviant behavior. We conclude the trial court did not abuse its discretion when it excluded this evidence.

Piel sought to discredit Wilson because he was the only witness to report the "murder" comments to superiors at the Department. Wilson applied three times for a

-14-

police officer position and was never hired. Piel claimed he recommended to his superiors that Wilson "not become a police officer" because Wilson had admitted to committing lewd acts. RP (Oct. 8, 2014) at 107. The City objected to the lewd behavior evidence but not the evidence about Piel's role in the Department's decision not to hire Wilson.

The deviant behavior evidence was not relevant to Wilson's bias. The trial court properly allowed, as relevant bias evidence, Piel's role in the Department's decision not to hire Wilson. The trial court properly exercised its broad discretion to exclude the deviant behavior evidence as more prejudicial than probative.[10] Nor does Piel show the exclusion of this evidence affected the verdict.

### Evidence of Previous Disciplinary Action

Piel claims the trial court erred when it excluded evidence of previous disciplinary action offered "to show the alleged reasons for the termination are pretext." Br. of Appellant at 39. He argues, "[a]ny prior . . . workplace violence or threats during the entire history of the FWPD, or any prior allegations of dishonesty, and how the City handled them" were relevant to their claims. Br. of Appellant at 39-40. Piel also asserts that pretext evidence "can be shown with evidence that similarly situation [sic] individuals were treated differently." Br. of Appellant at 39. The trial court did not abuse its discretion when it excluded evidence of those actions as irrelevant on grounds the proffered actions are factually dissimilar, too remote in time, and involve different decision makers.

---

[10] Even Piel's attorney recognized the danger of unfair prejudice when he argued to the trial court: "Your honor, sometimes the shocking nature . . . of conduct burns it into people's mind." RP (Oct. 8, 2014) at 107.

Piel sought to elicit testimony regarding three other disciplinary actions that occurred in the late 1990s and early 2000s.

### Otto/Stoneburner Incident

This incident involved Piel's 2006 termination and subsequent arbitration. In February 2006, Travis Stoneburner alleged that Officer Jeffery Otto choked him during a traffic stop and improperly confiscated his personal property. Piel, a lieutenant at the time, told Stoneburner to complete a complaint form and he would file it. In March 2006, Officer Otto detained an individual suspected of driving under the influence. Piel told Otto to release the suspect because he was a firefighter. Chief Kirkpatrick assigned Commander Steve Kelly to investigate the incident. During the investigation, Piel filed Stoneburner's incomplete complaint form. Piel described Officer Otto's allegedly unstable mental state to Commander Kelly. The Department initiated a second investigation against Piel during the firefighter investigation to determine Piel's motive and credibility in the Otto investigation. Piel was later terminated due to the firefighter incident but reinstated in a demoted capacity. Brian Wilson, who was a commander in the Department at the time, was not involved in either the investigation against Piel or the decision to terminate him.

### Greg Wilson Incident

This incident involved Chief Brian Wilson's brother, Greg Wilson. Greg Wilson denied creating a racially-charged screensaver for a monitor in a patrol car. The Department later learned he lied. Greg Wilson was not terminated. Ron Wood was the Chief when this incident occurred in 1998 or 1999. The Department's manual of standards changed in 2002. Piel tried to introduce this evidence over the City's

objection. The trial court sustained the objection: "it's too remote in time, involves different, um, set of facts, [and] different chiefs." RP (Oct. 16, 2014) at 74.

Brian Wilson Incident

This incident involved Deputy Chief Brian Wilson. In 2001, Wilson told a commander over the phone, "I don't want to meet with you. If I did, I might end up with my hands around your neck." Clerk's Papers (CP) at 711. Two years later, Chief Kirkpatrick investigated the incident. The Department determined that Wilson did not intend to assault the commander. The trial court precluded Piel from asking Wilson about this incident in part due to the different investigators involved in the earlier incident.

Piel contends the trial court erred when it prohibited cross-examination on these incidents because they demonstrate that the Department treated Piel differently than other individuals facing disciplinary action in the past.[11] Piel correctly asserts that an employer's different or inconsistent treatment of other employees may be relevant and

---

[11] Piel also complains he was prohibited from asking Chief Wilson whether the Department required a finding of "intent to deceive" for a dishonesty violation. Br. of Appellant at 40-41. The record shows that Piel repeatedly attempted to insert an additional "intent to deceive" requirement into the case. RP (Oct. 15, 2014) at 234-40. But Chief Wilson explained that a finding of dishonesty presumes intent to deceive:

> [Plaintiff's Counsel]: Did you tell Amy Stephson that she had to find intent to deceive?
> [Commander McAllester]: She didn't have to find intent to deceive.
> [Plaintiff's Counsel]: Okay. Because you didn't ask her to find it; right?
> [Commander McAllester]: No, we asked—dishonesty is—includes the intent to deceive. So she found dishonesty.

RP (Oct. 20, 2014) at 159. Despite this response, Piel continued to press the issue. The City objected, alleging the line of questioning was argumentative and that the question had been asked and answered. The trial court sustained the objection. The record shows that Piel was not prohibited from asking Chief Wilson about the alleged "intent to deceive" requirement; he simply was unhappy with Chief Wilson's answer.

-17-

admissible in a wrongful termination case under appropriate circumstances. See, e.g.,

Fulton v. Dep't of Soc. & Health Servs., 169 Wn. App. 137, 161-62, 279 P.3d 500

(2012). However, "[t]he trial court has broad discretion to determine when the

circumstances are appropriate." Lords v. Northern Automotive Corp., 75 Wn. App. 589,

610, 881 P.2d 256 (1994). When the circumstances of a previous disciplinary action

differ from the employment action at issue, a trial court does not abuse its discretion

when it excludes evidence of the previous action as irrelevant or prejudicial. See

Roberts v. Atlantic Richfield Co., 88 Wn.2d 887, 893, 568 P.2d 764 (1977). In Roberts,

an age discrimination case, the court upheld the trial court's decision to exclude

witnesses who had allegedly been terminated due to their age because "[t]he offer of

proof contained no evidence that these employees held comparable positions with Arco,

that they worked under similar circumstances, or that they had been discharged in a like

manner. The trial court rejected this offer of proof as irrelevant and too remote to be of

significant value." Roberts, 88 Wn.2d at 893. In Lords, the court held that the trial court

did not abuse its discretion when it excluded testimony from another terminated

employee because that employee had been evaluated by a different superior than the

one who had terminated the plaintiff:

> Northern contends the trial court did not abuse its discretion in
> refusing to allow Mr. Hibbs to testify because the circumstances of his
> layoff were irrelevant. He did not hold the same position as [the plaintiff]
> and his performance was evaluated by Lords, not Streeter [the supervisor
> who terminated the plaintiff].
>     . . . .
> When evidence is likely to confuse or mislead a jury, it may result in
> unfair prejudice. The trial court did not abuse its discretion when it
> determined the excluded evidence would be confusing or misleading.

Lords, 75 Wn. App. at 610 (emphasis added).

-18-

The trial court did not abuse its discretion when it prohibited Piel from introducing dissimilar evidence of previous disciplinary actions. Piel's prior discipline evidence involved different investigators and decisions makers. And the two Wilson incidents occurred under an older version of the standards policy.

Piel argues no authority requires the same decision makers to admit prior events. We are not persuaded by this argument. In Lords, that a different employee was evaluated by a different superior than the plaintiff was a factor to determine whether that employee's testimony was relevant. Generally, when a prior employment decision is admitted to show the plaintiff was treated differently than other employees, that prior decision was made by the same decision maker as the one responsible for the action giving rise to the lawsuit. See, e.g., Sellsted v. Washington Mutual Savings Bank, 69 Wn. App. 852, 861, 851 P.2d 716 (1993). The trial court properly exercised its broad discretion to determine whether a prior employment action is sufficiently different to justify exclusion of that evidence. Lords, 75 Wn. App. at 610.

### Testimony on Piel's Other Comments

Piel argues that the trial court erred when it admitted evidence of comments he made that offended two female officers. Piel argues this evidence was irrelevant because Chief Wilson based Piel's termination on the "murder" comments, not his other offensive comments.

This claim is waived. RAP 2.5; State v. Atkinson, 19 Wn. App. 107, 575 P.2d 240 (1978) (waiver through failure to object or by voluntarily broaching the matter at trial). Piel failed to timely object to this evidence. During motions in limine, Piel moved to exclude testimony of the two female officers—Officers Baker and Scholl—regarding

Piel's offensive comments. The trial court deferred its ruling and told Piel to "bring it up" later during the trial. RP (Oct. 8, 2014) at 65. The first mention of these offensive comments occurred when the City cross-examined Officer Bassage. Piel failed to object. Piel's attorney later also asked Officer Ellis about the same offensive comments he now claims should have been excluded. RP (Oct. 14, 2014) at 208-09 (Piel's attorney: "I just like to ask you about the . . . these comments from Scholl and—and [Baker]. What—what did you hear and what was your take on that?"). Piel finally objected when the City called Officer Baker as a witness. But by then the jury had already heard the objectionable evidence. And Piel never requested a curative instruction.

The trial court also acted well within its discretion when it permitted the City to introduce these offensive comments. Although Piel's termination was primarily due to the "murder" comments, the other offensive comments were relevant to the Department's investigation and its conclusion that Piel had been dishonest. For example, Arbuthnot testified that he considered the offensive comments as part of his investigation. Commander McAlester considered Piel's offensive comments in her recommendation for disciplinary action. Stephson wrote in her report that the conflicting testimony about Piel's offensive statements was directly relevant to her conclusion that Piel was not credible. The trial court properly admitted this evidence as more relevant than prejudicial. Piel also fails to show how the evidence affected the verdict.

The Trial Court's Summary Judgment Orders

There are two summary judgment issues relevant to this appeal. The first is whether Piel may rely on either the Federal Way Employee Guidelines or the filing of a

-20-

notice of damages claim pursuant to RCW 4.96.020 as a source of public policy for purposes of his wrongful termination claim. The second is whether he is collaterally estopped from pursuing claims related to his 2006 discharge.

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003). Summary judgment is proper if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. CR 56(c); Michak, 148 Wn.2d at 794-95.

Source of Policy for Purposes of Wrongful Discharge

Piel claims the trial court erred when it concluded that neither (1) his complaints to human resources under the Federal Way Employee Guidelines nor (2) his filing of a notice of damages claim pursuant to RCW 4.96.020 was protected conduct giving rise to a wrongful discharge claim. Wrongful discharge in violation of public policy requires four elements:

(1) The plaintiffs must prove the existence of a clear public policy (the clarity element);

(2) The plaintiffs must prove that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element);

(3) The plaintiffs must prove that the public-policy-linked conduct caused the dismissal (the causation element);

(4) The defendant must not be able to offer an overriding justification for the dismissal (the absence of justification element).

Roe v. TeleTech Customer Care Mgmt. LLC, 171 Wn.2d 736, 756, 257 P.3d 586 (2011). The only issue here is whether the employee guidelines or RCW 4.96.020 provide a clear public policy sufficient to satisfy the clarity element.

Wrongful discharge in violation of public policy is a narrow exception to the at-will employment doctrine that balances the employee's interest in job security and the employer's interest in making personnel decisions without fear of liability. Roe, 171 Wn.2d at 755. To maintain this balance, courts will not permit an action for wrongful discharge absent "[a] clear mandate of public policy sufficient to meet the clarity element [that is] truly public; it does not exist merely because the plaintiff can point to legislation or judicial precedent that addresses the relevant issue." Roe, 171 Wn.2d at 757. Courts must "'find', not 'create' public policy and the existence of such policy must be 'clear.'" Selix v. Boeing Co., 82 Wn. App. 736, 741, 919 P.2d 620 (1996) (quoting Roe v. Quality Transp. Servs., 67 Wn. App. 604, 610, 838 P.2d 128 (1992)).

In Thompson v. St. Regis Paper Co., the court explained that an employer's conduct must violate a clear legislative or judicial expression of public policy:

> "In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject."

102 Wn.2d 219, 232, 685 P.2d 1081 (1984) (emphasis omitted) (quoting Parnar v. Americana Hotels, Inc., 65 Haw. 370, 380, 652 P.2d 625 (1982)). Generally, courts recognize a clear violation of public policy in four situations:

> (1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3) where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistleblowing.

Gardner v. Loomis Armored, Inc., 128 Wn.2d 931, 936, 913 P.2d 377 (1996). The issue here is whether either the Federal Way Employee Guidelines or RCW 4.96.020 clearly create a "legal right or privilege" sufficient to sustain a claim for wrongful discharge in violation of public policy. Gardner, 128 Wn.2d at 936.

Piel has failed to show that the Federal Way Employee Guidelines constitute a "clear mandate of public policy" for purposes of a wrongful discharge claim. Roe, 171 Wn.2d at 757. In 2005, Piel filed several complaints with the City's human resources department under the Federal Way Employee Guidelines. He alleged the City failed "to follow its own Employee Guidelines concerning the preparation of 'Employee Performance Appraisals.'" CP at 14-15. He disputed his performance appraisals and filed a second complaint when he learned the disputed appraisal would be placed in his permanent personnel file. Piel argues that filing these complaints is a protected activity for purposes of a wrongful discharge claim.

But the employee guidelines do not create a public "legal right or privilege." Gardner, 128 Wn.2d at 936. They are not a "constitutional, statutory, or regulatory provision or scheme," and Piel fails to cite any authority supporting the proposition that the employee guidelines create a public legal right or privilege sufficient for a wrongful

discharge claim.[12] Thompson, 102 Wn.2d at 232. Piel cites Bravo v. Dolsen Companies, 125 Wn.2d 745, 888 P.2d 147 (1995). Bravo involved a statute that granted "substantive rights upon employees to be free from interference, restraint, or coercion." Bravo, 125 Wn.2d at 758 (discussing RCW 49.32.020). Unlike Bravo, the guidelines at issue here do not stem from a statutory scheme, nor do they confer analogous substantive rights.

RCW 4.96.020 also creates no legal right or privilege sufficient for Piel's wrongful discharge claim. RCW 4.96.020 details procedural requirements before an individual may sue a government entity. The statute requires that "[a]ll claims for damages against a local governmental entity . . . shall be presented to the agent within the applicable period of limitations within which an action must be commenced." RCW 4.96.020(2). Piel argues that because filing a notice of a claim for damages is required by the statute prior to commencing a tort claim against the City, it is protected conduct for purposes of a wrongful termination claim.

But the statute is primarily procedural; it does not grant any "substantive rights upon employees." Bravo, 125 Wn.2d at 758. Further, courts have recognized that the purpose of the statute is to protect government entities, not the public: "The purpose of this [notice of tort] claim is to allow government entities time to investigate, evaluate, and settle claims before they are sued." Fast v. Kennewick Public Hosp. Dist., 188 Wn. App. 43, 54, 354 P.3d 858 (2015) (quoting Renner v. City of Marysville, 168 Wn.2d 540, 545, 230 P.3d 569 (2010)). Although filing a lawsuit against one's employer is arguably

---

[12] Indeed, Piel only spends two sentences in his opening brief arguing the Guidelines constitute a clear mandate of public policy.

-24-

protected activity, the public policy protecting this action does not stem from RCW 4.96.020. As discussed above, to sustain a claim for wrongful discharge in violation of public policy, the source of public policy must be a clear mandate, and "courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject." Thompson, 102 Wn.2d at 232; see also Selix, 82 Wn. App. at 741 (courts must "'find,' not 'create' public policy and the existence of such policy must be 'clear'"). Piel has failed to show that RCW 4.96.020 provides a clear mandate of public policy sufficient to sustain his wrongful discharge claim.

Collateral Estoppel

Piel also argues the trial court erred when it ruled that he was collaterally estopped from asserting that his 2006 discharge was motivated by anti-union animus.

Collateral estoppel prevents relitigation of an issue after the estopped party has already had a full and fair opportunity to present its case. Pederson v. Potter, 103 Wn. App. 62, 69, 11 P.3d 833 (2000). "It is well settled that in an appropriate case the decision in an arbitration proceeding may be the basis for collateral estoppel or issue preclusion in a subsequent judicial trial." Robinson v. Hamed, 62 Wn. App. 92, 96-97, 813 P.2d 171 (1991); see also Piel, 177 Wn.2d at 615 ("an employee who loses in an administrative arbitration proceeding . . . may be collaterally estopped from asserting a wrongful discharge claim."). There are four requirements for collateral estoppel to apply:

> (1) the issue decided in the prior adjudication must be identical with the one presented in the second; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice.

-25-

Pederson, 103 Wn. App. at 69. The trial court correctly ruled that Piel is collaterally estopped from arguing his 2006 termination was motivated by anti-union animus.

Piel mainly argues that the trial court erred because the issue in his 2007 arbitration was not identical to the claim he alleged in his complaint to the trial court— that his 2006 termination was motivated by anti-union animus. He claims "there was a reasonable hypothesis that the issues were not identical for collateral estoppel purposes." Br. of Appellant at 50. But the record shows the arbitration did address whether the Department terminated Piel due to anti-union animus. The arbitration focused on whether the "just cause" existed to terminate Piel. This analysis required the arbitrator to consider whether the Department applied its rules "evenhandedly and without discrimination to all employees." Ex. 31 at 16. Indeed, Piel argued that the Department lacked just cause because it was motivated by anti-union animus. In his brief to the arbitrator, Piel even identified the elements for a wrongful discharge claim:

> An employer's decision to impose discipline cannot be based on the improper motive of bias against a labor organization . . . This issue commonly arises where the target of discipline is a union officer or activist, where there is a pattern of more lenient discipline for similar offenses in the past, and where the relationship between the labor organization and the employer is a difficult one . . .
> A claim for wrongful termination in violation of public policy exists where a Plaintiff proves 1) The existence of a clear public policy; 2) that discouraging the conduct would jeopardize the public policy; 3) that public policy-linked conduct caused the termination; and 4) that the employer's justification for termination was pre-textual . . .
> [The evidence] documents a pervasive history of harassment and retaliatory conduct directed at Lt. Piel.

CP at 263. During opening argument, Piel's attorney—the same attorney who represented him at trial and in this appeal—expressly argued that the Department lacked just cause to terminate Piel because the termination was retaliatory:

> It's our position in this matter that Bud Piel was not terminated for just cause and that the actions against Lieutenant Piel were retaliatory. There was retaliation directed against him because of union involvement, which you'll hear through this arbitration, and also retaliation because there was a filing by Lieutenant Piel of a claim for damages . . . against the City arising from actions directed at him resulting from his union involvement.

CP at 270. The arbitrator considered the Department's alleged anti-union animus when he determined whether just cause existed to terminate Piel. A finding that Piel's termination was motivated by anti-union animus precluded a finding of just cause.

Piel does not dispute the trial court's conclusions on the remaining collateral estoppel elements. They are satisfied under the circumstances here. The trial court properly granted partial summary judgment on these two issues.

<u>CONCLUSION</u>

For the foregoing reasons, we affirm the judgment on the jury's verdict.

WE CONCUR:

-27-